No. 88,327

STATE OF KANSAS, *Appellee*, v. PATRICK HOBBS, *Appellant*.

(71 P.3d 1140)

Opinion filed July 11, 2003.

*Jonathan L. Laurans*, of Kansas City, Missouri, argued the cause and was on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *David C. Smith*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Patrick Hobbs was convicted by a jury of involuntary manslaughter, aggravated battery, and leaving the scene of an injury accident. He appeals his convictions and sentence. This appeal was transferred from the Court of Appeals on this court's own motion pursuant to K.S.A. 20-3018(c).

Hobbs raises the following issues on appeal:

1. Whether evidence of Hobbs' blood alcohol content was properly admitted.

2. Did the trial court err in failing to grant a mistrial when a juror had contact outside the courtroom with a State's witness?

3. Did the trial court err in admitting testimony that Hobbs had been ejected from Sandstone Amphitheater and a photograph of the deceased?

4. Should the out-of-state State's witnesses have been permitted to testify even though their appearances were not procured according to the Uniform Act to Secure Attendance of Witnesses from Without State?

5. Did the trial court err in excluding the county coroner's report of death from evidence?

6. Did the prosecutor's remarks in closing argument about the lack of evidence of any product malfunction improperly shift the burden of proof to defendant?

7. In sentencing, did the district court properly classify Hobbs based on his criminal history?

On June 5, 2000, Brad Hewitt and Jathan Stevenson went to a concert at Sandstone Amphitheater in Bonner Springs, Kansas. Brad was driving a red Camaro. Defendant Patrick Hobbs also went to that concert. He was driving a black Ford Explorer.

After the concert, traffic on Highway 7 was extremely heavy and barely moving. Witnesses who were stuck in the traffic saw a Ford

Explorer, which was driving on the right shoulder of the road, swerve from the shoulder onto the roadway. One witness described the occurrence as the Explorer attempting to cut back into the lane of traffic. Another said that the Explorer veered over from the unobstructed shoulder onto the road.

Witnesses' estimates of the speed the Explorer was traveling on the shoulder ranged from "pretty fast" and "fairly fast" to "cruising," compared to the stop-and-go roadway traffic, to "[a]nywhere from 55 to 60 miles an hour" to "[i]t looked like it had to be going at least 80 miles an hour." When the Explorer veered onto the roadway, it hit a red Camaro. One witness said that the Explorer "[j]ust drove right over the top of this little red car," and another testified that the Explorer "ramped up over" the car it hit. Several witnesses testified that the Explorer became "airborne." Before coming to rest on its side, the Explorer also hit a Ford Thunderbird and a white Jeep.

Brad Hewitt was hospitalized with serious injuries. The driver of the Thunderbird was injured and taken by ambulance to a hospital. Jathan Stevenson died from multiple crush injuries received in the automobile collision.

The Explorer came to rest on its driver's side. Two people who had been in the Jeep helped Hobbs crawl out of the passenger side door of the Explorer. Hobbs was wearing khaki trousers; he was not wearing a shirt. Shortly after emerging from the Explorer, Hobbs tried to get back into it but he was warned away on account of leaking gasoline.

In the early morning hours of June 6, 2000, a young man wearing only khaki pants approached the service desk at a motel in Bonner Springs. He gave his name as Hobbs and asked to use the house telephone to page someone so that he could get a ride. He was scraped, cut in several places, and bleeding and said that he had been ejected from Sandstone for fighting. When the motel clerk suggested calling the police, Hobbs left. The clerk called the police.

A police officer who was dispatched from the accident to the motel later spotted Hobbs in the vicinity running near a fast-food restaurant and pursued him on foot. The officer lost sight of Hobbs. Two K-9 units were called in. While a foot search was being con-

ducted with the dogs, Hobbs was located and arrested on K-7 highway going south. He was transported to a holding cell in Bonner Springs.

Additional facts are developed as necessary in the discussions of various issues.

Hobbs first challenges the admission of evidence of his blood alcohol content.

The first officer arrived at the scene of the accident at approximately 11:50 p.m. on June 5, 2000. He was advised by witnesses that the driver of the Ford Explorer had run away. At the scene, an inventory of the contents of the Ford Explorer revealed two Busch beer cans, wallets, pagers, a cooler with ice in it, and an unopened bottle of Rolling Rock beer. One of the wallets contained identification for Hobbs.

Hobbs, who initially gave his name as Jim Gaines, was located by Officer Bogart approximately 2 to 2½ miles from the accident scene. At approximately 2:50 a.m., Hobbs was taken into custody and transported to the Bonner Springs City Hall. He smelled of alcohol, and his eyes were bloodshot and watery.

Officer Ruhulessin read the implied consent form to Hobbs that informs a person of the consequences of refusing to submit to breath, blood, or urine tests for alcohol and/or drugs. Ruhulessin testified that Hobbs appeared to be intoxicated at the time. "His eyes were bloodshot, watery, glazed and droopy. His speech was slurred and mumbled. His—there was a strong odor commonly associated with an alcoholic beverage emitting from his breath." After he refused to submit to a blood test, Hobbs was taken to a hospital for the purpose of having blood withdrawn. His blood was taken for testing by an emergency room nurse.

Hobbs filed motions to suppress the results of the blood test on the grounds that taking his blood constituted an unreasonable search and that K.S.A. 2000 Supp. 8-1001(f)(1) is unconstitutional. On appeal, Hobbs challenges the constitutionality of K.S.A. 2000 Supp. 8-1001(f)(1) on the ground that it supplies probable cause to believe defendant operated a vehicle under the influence of alcohol or drugs "if the vehicle was operated by such person in such a manner as to have caused the death of or serious injury to

another person." The portion of the statute complained of by Hobbs has no application to this case because Hobbs' slurred and mumbled speech, bloodshot, watery, glazed, and droopy eyes, strong odor of alcohol, and the evidence linking him with operation of the Ford Explorer constituted ample bases for probable cause to believe that he operated a vehicle under the influence of alcohol or drugs. "A defendant to whom a statute may constitutionally be applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally in circumstances not before the court." *State v. Papen*, 274 Kan. 149, 162, 50 P.3d 37, 46 (2002).

Hobbs also complains that the district court erred by admitting the results of his blood alcohol test into evidence. He contends that, because the test result was below the legal limit for DUI, it was irrelevant and confusing to the jurors. The admission or exclusion of evidence lies within the sound discretion of the trial court. A defendant asserting that the trial court abused its discretion bears the burden of showing that the trial court's action was arbitrary, fanciful, or unreasonable. *State v. Lessley*, 271 Kan. 780, 791, 26 P.3d 620 (2001). K.S.A. 2002 Supp. 8-1567(a)(2) provides that evidence of a blood alcohol concentration of .08 or more establishes a per se DUI violation, but a DUI violation may be established under other subsections of 8-1567(a) without regard for the alcohol concentration in the person's blood or breath. Hobbs was not charged under K.S.A. 2002 Supp. 8-1567 with DUI, per se or otherwise, but the jury was instructed on involuntary manslaughter while driving under the influence as a lesser offense of murder in the second degree. Hobbs has not shown that admission of the result of his blood alcohol test was unreasonable in the circumstances. It also appears that any error in admission of the test result was harmless to Hobbs. On Count I, the jury not only found Hobbs not guilty of murder in the second degree (killing Stevenson unintentionally but recklessly under circumstances showing extreme indifference to the value of human life) but also not guilty of involuntary manslaughter while driving under the influence.

Hobbs next argues that the court should have declared a mistrial when a juror had contact outside the courtroom with a State's witness.

During the noon recess of trial on the day when Officer James R. Todd was testifying for the State, one of the jurors approached the witness. The juror asked Todd, "With all that equipment, you must have a large truck to carry all that in. Would you have a semi?" Todd responded, "No, sir. We have a Peterbilt truck that has a motor home attachment on it." No other statements were made by Todd. The conversation took place in the hallway with a number of other people around. After their brief discussion of the truck, Todd excused himself and reported the incident to the prosecuting attorney.

After hearing Todd's testimony about the incident, counsel for Hobbs requested a mistrial. Stating his impression that it "was a very innocent contact" on a topic "that doesn't have anything to do with this case," the district judge denied the motion for a mistrial. Counsel for Hobbs requested, in the alternative, the opportunity to question the juror "in camera, with counsel present, to determine whether or not that juror has a propensity to be at least prejudiced toward the State in this case, considering the fact that he has contacted and discussed an issue with a State witness." The district court denied the request.

Communication between a juror and a witness is not a ground for reversal unless the communication is shown by the defendant to have substantially prejudiced his or her rights. *State v. Whitesell*, 270 Kan. 259, 286, 13 P.3d 887 (2000); *State v. Macomber*, 244 Kan. 396, 407, 769 P.2d 621 (1989) (overruled on other grounds). A trial court's denial of a motion for mistrial on the basis of juror misconduct is subject to an abuse of discretion standard of review. 270 Kan. at 286.

Hobbs complains that the trial court's refusing to question the juror or to permit defendant's counsel to question the juror about his communication with the witness prevents him from satisfying his burden of proving prejudice. In *Macomber*, the court rejected substantially the same argument. There, Poe, a witness for the State was observed talking to a juror as they left an elevator together. 244 Kan. at 406-07. "Poe testified if he said anything to the juror, it was simply a comment such as 'go ahead' to let the juror exit ahead of him. He also testified a highway patrolman was in the

elevator at the time." 244 Kan. at 407. The trial court found no impropriety and refused to examine the juror " 'about a non-event.' " 244 Kan. at 407. Reviewing the issue on appeal, this court stated:

"It is the usual practice to question the juror involved in complaints alleging misconduct. [Citations omitted.] . . .

"However, the determination of a witness' credibility in such circumstances is within the trial court's discretion. The court believed Poe's testimony and, as an experienced observer of the circumstances surrounding the case, did not believe impropriety occurred. Macomber had the opportunity to obtain the testimony of the juror in support of his motion for a new trial. This he failed to do. We conclude Macomber failed to sustain the burden of proving juror misconduct." 244 Kan. at 407-08.

Hobbs would distinguish *Macomber* on the ground that the communication between the juror and Trooper Todd, instead of being a "non-event," bore directly on Todd's investigation into the accident at issue. Hobbs is on the verge of trivializing his position by suggesting that a question about the size of the Trooper's vehicle has any bearing on the evidence and substance of the investigation into an accident that killed one young person and injured others. We agree with the trial court's view that it was an innocent contact on a topic unrelated to the prosecution.

Hobbs next argues that testimony that he had been ejected from Sandstone Amphitheater and a photograph of the deceased should not have been admitted into evidence.

As previously stated, the admission of evidence lies within the sound discretion of the trial court. A defendant asserting that the trial court abused its discretion bears the burden of showing that the trial court's action was arbitrary, fanciful, or unreasonable. *State v. Lessley*, 271 Kan. 780, 791, 26 P.3d 620 (2001).

Hobbs complains that the trial court erred by allowing the State to elicit testimony that Mr. Hobbs had been ejected from Sandstone Amphitheater. Two motel clerks testified that Hobbs explained his appearance by telling them he had been in a fight and had gotten kicked out of the concert at Sandstone. There was no objection to the first clerk's testimony. After the second clerk gave essentially the same testimony, defense counsel objected that the

evidence was inadmissible pursuant to K.S.A. 60-455. The objection was overruled. A third State witness, someone who had ridden to Sandstone with Hobbs, testified that he saw security guards escort Hobbs out of the concert. Defense counsel's objection was overruled.

A timely objection to the admission of evidence at trial must be made in order to preserve that issue for appeal. K.S.A. 60-404; *State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999). Because there was no objection to the first clerk's testimony, only the repetition of the evidence is a proper subject for review. Once the jury heard the first clerk testify that Hobbs said he had been ejected from Sandstone for fighting, the subsequent testimony added nothing prejudicial. Hobbs contends that the testimony prejudiced him by casting him in a bad light, but he offers no grounds for finding that the alleged prejudice did not arise from the unobjected testimony.

Hobbs also complains of the admission of a photograph of the head and a shoulder of the deceased. The State offered the photograph during the pathologist's testimony about his external examination of the body, which showed abrasions and lacerations concentrated around the face and upper neck. The trial court admitted the photograph as illustrating the doctor's testimony.

The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent a showing of an abuse of that discretion. *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001). In this case, the photograph is not objectionable on the ground that it is repetitious because only one photograph of the victim was offered by the State. That photograph was relevant and used by the pathologist to demonstrate his point about the deceased's external wounds. Furthermore, contrary to Hobbs' contention, there is no "extraordinary degree of . . . gruesomeness" in the photograph. It cannot be compared to the photographs in the case relied on by Hobbs, *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975), in which 14 autopsy photographs were offered, including one showing "the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant." Hobbs

has not shown an abuse of the trial court's discretion in admitting the single autopsy photograph of the head and shoulder of the victim.

Hobbs' argument that out-of-state State's witnesses should not have been permitted to testify because their appearances were not procured according to the Uniform Act to Secure Attendance of Witnesses from Without State, although creative, has no merit.

According to Hobbs, "[t]he State procured the presence of several out-of-state witnesses by merely mailing subpoenas to them without first securing the permission and assistance from the authorities in the counties of the witnesses' residences." He contends that the proper remedy for the State's failure to comply with provisions of the Uniform Act to Secure Attendance of Witnesses from Without State, K.S.A. 22-4201 *et seq.*, is reversal of his convictions and remand for a new trial. He cites no authority for his contention.

As the State observes, the purpose of the Uniform Act is to secure the attendance of witnesses who are outside the jurisdiction of the district court. The Act has no application when witnesses are willing to testify irrespective of the method of process.

Hobbs argues that the trial court erred in not allowing into evidence the county coroner's report of death.

The district court excluded from evidence the report of death form for Jathan Stevenson. The single-page report of death form lists the place, date, time, and manner of death. The manner of death is identified as "[a]ccidental." The circumstances of death are described as follows: "Decedent was a passenger in an automobile which was involved in a multi vehicle accident. He was taken to KU E.R. where he died." The final diagnosis is given as "[m]ulti system trauma." In refusing to admit the document, the trial judge told defense counsel that he was "not going to allow [him] to put that into evidence to show this was an accident." On appeal, Hobbs reveals that his purpose in offering the document indeed was to show that "the State's own investigators . . . concluded that this was a traffic accident, not a murder as charged by the prosecution." He contends that the exclusion was highly prejudicial and requires reversal of his convictions.

Hobbs offers two theories why the trial court's ruling was arbitrary. First, the document was the subject of cross-examination of Dr. Pojman, who performed the autopsy of Stevenson. Pojman testified that he made a written report of his autopsy findings but that it was the district coroner, Dr. Hancock, who made the report of death. Dr. Pojman's testifying that he did not complete the report of death form is not a reason for admitting the document during his testimony. Second, the report is an official court record admissible pursuant to K.S.A.2002 Supp. 60-460(o), the content of official records. The statute provides that hearsay evidence is inadmissible except for enumerated exceptions. Exceptions to the hearsay rule are not automatically admissible but rather are subject to other safeguards of trustworthiness and relevance as well as the discretion of the trial court. However, the lack of trustworthiness or relevance was not the reason given by the trial court for excluding the report. The report speaks for itself, is admissible under K.S.A. 2002 Supp. 60-460(o), and is relevant. There is no question that Jathan Stevenson died as a result of injuries resulting from a motor vehicle accident. Dr. Pojman, deputy coroner, testified as to the extent of Stevenson's injuries and the cause of death. He testified that Stevenson

"died from multiple crush injuries which were received during the automobile accident. There was a combined effect of blood loss into the lung area, and also aspiration of blood. That means blood from the fracture of the jaw is brought down, and instead of being swallowed, brought into the airway and into the lungs, and basically the blood will fill the lungs causing suffocation."

As previously noted, the jury found Hobbs guilty of involuntary manslaughter, *i.e.*, that he unintentionally killed Stevenson and it was done recklessly. The trial court's exclusion of the report was error. However, under the harmless error rule of K.S.A. 60-261, a trial court's error in the admission of evidence is not grounds for reversal unless failure to set aside the verdict appears inconsistent with substantial justice. *State v. Mullins*, 267 Kan. 84, Syl. ¶ 4, 977 P.2d 931 (1999). Here, the exclusion of the coroner's report did not prejudice the substantial rights of Hobbs and was not inconsistent with substantial justice. The error was harmless.

Hobbs' final argument relative to his convictions is that the prosecutor's remarks in closing argument about the lack of evidence of any product malfunction improperly shifted the burden of proof to the defendant.

On cross-examination of Officer Pearce, defense counsel introduced the subject of the tires on the Ford Explorer. Counsel asked whether the witness was aware that the type of tires on the Explorer were the subject of a recall that began shortly after the accident. Counsel asked whether it was warm on the date of the accident and then asked whether the witness was aware that the tires have a propensity for failing in warm weather. Counsel asked whether the tires had been removed from the Explorer for inspection and testing, and Pearce answered that they had not. The cross-examination concluded with the following questions and answers:

"Q. Did you investigate other causes of this accident like mechanical defect failure, the tires?
"A. I know I didn't.
"Q. Don't you think that would be a fair thing to do in order to be fair to Mr. Hobbs, give him the benefit of the doubt and say, 'Let's determine whether there may have been another cause of this accident?'
"A. Yes."

During closing argument, defense counsel stated:

"You need to look at Officer Pearce's testimony. I asked him, I said, 'Do you think it was fair to Patrick Hobbs to not even check those tires that you know as well as everybody else knows are causing accidents and death all over the country?' And he said no, that wasn't fair. It wasn't fair. If the investigation isn't fair, how can anything after the investigation be fair? If you can't trust what the lead investigator does from day one when he's busy running around, getting everybody to say I got a white T-shirt with his blood on it instead of looking at causes of the accident, how can you—how can you trust the rest of their case? If they're going to charge him with the ultimate crime, they need to do the ultimate investigation. Serious crimes require serious investigation. We've got none here. If you have a concern at all about any of these issues about this investigation, then you've got to have reasonable doubt in this case . . . . This was slapped together. They wrapped up their investigation the day of the accident, the day after . . . it happened, . . . [Y]ou need to remember Detective Pearce, the chief investigating officer, the lead man for the police, the lead witness for the State of Kansas. The guy they saved to the end. He walked away from here saying, 'I wasn't fair to

Patrick Hobbs. I wasn't fair in the way I conducted my investigation.' And if he wasn't fair, nothing after that can be fair, and I ask you to find him not guilty."

In the rebuttal portion of his closing argument, the prosecuting attorney stated:

"Why didn't they check the brakes? Why didn't they check the accelerator? Why didn't they check some of these things? Well, they asked Sergeant Todd, 'Did you check this thing, did you pull this thing,' and I asked him, 'Do you normally do this?' He says, '[W]ell, we don't normally do this unless we have reason to believe that something else caused it.' That's what he said. They had no reason to believe. Now, there was a recall on Firestone tires. Everybody has seen that in the news, but how do you explain somebody flying down the side of the road going very, very fast, swerving over and he just happened to be drunk? What about malfunctions? There's no evidence that there was any malfunction. There hasn't been any evidence presented to you that there was a malfunction. You'd have to believe that the brakes stopped working, that the accelerator stuck, that the tires popped, all at the same time. That everything malfunctioned all at once. Not plausible."

Hobbs asserts that these comments "could only have been construed by the jury to mean that there was no evidence of malfunction *presented by the defense*." And he relies on cases involving comment on defendant's failure to testify in arguing that the State's remarks shifted the burden of proof and require reversal of his convictions.

Hobbs' argument bears no relation to the actual circumstances. The State's remarks were in direct response to defense counsel's cross-examination about investigation of the Firestone tires and, in particular, to defense counsel's closing argument that the investigation was not fair to Hobbs because the tires had not been checked. The State, by directing the jurors' attention to the evidence, properly responded to defense counsel's attempt to divert the jurors' attention to matters outside the evidence with his suggestions of malfunction and unfairness. The prosecutor's observation that there was no evidence of a malfunction was a direct and proper response to defense counsel's argument and did not shift the burden of proof.

As to his sentencing, Hobbs contends the district court improperly classified him based on his criminal history.

Hobbs had three felony convictions before he was charged with the offenses in the present case—two residential burglaries and

attempted possession of marijuana with intent to sell. This issue arises because in Case No. 94JV2481, the complaint charging the first residential burglary states that the offense is "a severity level 7 non-person felony" rather than a severity level 7 person felony, which is the statutory classification of the offense. The complaint states that on October 20, 1994, Hobbs "did then and there unlawfully, willfully, feloniously, knowingly and without authority enter into a building, to-wit: house owned by Cynthia Britt, which is a dwelling with the intent to commit a theft, a severity level 7 non-person felony, therein, in violation of K.S.A. 21-3715." K.S.A. 21-3715(a) provides: "Burglary is knowingly and without authority entering into . . . any . . . [b]uilding . . . which is a dwelling with intent to commit . . . theft." The statute further provides: "Burglary as described in subsection (a) is a severity level 7, person felony."

The Journal Entry in Case No. 94JV2481 repeats the mistaken classification:

"The Respondent then admitted his guilt as to COUNT II of Complaint 94JV2481. The Court found this plea was freely and voluntarily given, and that there was a sufficient factual basis [f]or this plea. The Respondent was determined to be a Juvenile Offender as to COUNT II of Complaint 94JV2481 (Felony, K.S.A. 21-3715, Severity Level 7, non-person felony), within the meaning of the Juvenile Code of the State of Kansas, applicable thereto."

Hobbs was placed on probation.

A journal entry of judgment in Johnson County Case No. 96CR1000 shows that Hobbs pled guilty in June 1996 to violation of K.S.A. 21-3715, a severity level 7 person felony. His criminal history classification was nondrug D, and there was no objection to the criminal history. In 1998, he pled guilty to attempted possession of marijuana with intent to sell in Johnson County Case No. 97CR2873. The presentence investigation report that was prepared in the marijuana case listed the burglary in 94JV2481 as a person felony. The journal entry of judgment shows that there was no objection to the criminal history.

Based on its review of this history, the trial court concluded that defendant's objection to the criminal history should be overruled:

"This court finds that the categorization of the residential burglary which was the foundation of the defendant's 1994 juvenile conviction as a non-person felony in both the charging language and the Journal Entry signed by the judge was a clerical error. This becomes obvious when taking into consideration the obvious in-depth plea negotiations which occurred between defendant's counsel and the District Attorney's office in negotiating a downward departure in his sentence in Case No. 94 [*sic*, should be 97] -CR-2873 in the Johnson County District Court in which the defendant's juvenile burglary conviction was scored as a person felony which, along with the remainder of his criminal history, placed him in the B category on the sentencing grid. That placement on the sentencing grid without any departure would have resulted in the defendant being sentenced in the presumptive sentencing range of 35, 38, or 41 months. The fact is that as a result of plea negotiations between the parties, it was agreed to recommend to the judge a downward durational departure to 26 months which recommendation the judge accepted and so sentenced this defendant.

"There is absolutely nothing in the record before this court surrounding the compilation and approval of the contents of the presentence investigation and criminal history pursuant to sentencing in the 97-CR-2873 case which would suggest to this court that the defendant's counsel, in approving the criminal history contained in the presentence investigation at that time, was anything less than diligent and competent in checking and approving the accuracy of the presentence investigation at that time."

On appeal, Hobbs takes exception to the trial court's determining that the nonperson language in the 94JV2481 complaint and journal entry is due to a clerical error. He argues that no greater offense than the one he was charged with and convicted of, *i.e.*, severity level 7 nonperson felony for the burglary in Case No. 94JV2481, can be used in calculating his criminal history.

Hobbs' arguments are without merit. His failure to object to the categorization of person felony of the 1994 burglary at the time of sentencing in the drug case permits the trial judge in the present case to take judicial notice of the Presentence Investigation (PSI) report that was a part of the record in Case No. 97CR2873. In nearly identical circumstances, the Court of Appeals stated:

"Hatt failed to object to the categorization of person felony of the California conviction of burglary at the time of sentencing for No. 96 CR 209 under K.S.A. 27-4715(c), which provides:

'Upon receipt of the criminal history worksheet prepared for the court, the offender shall immediately notify the district attorney and the court with written notice of any error in the proposed criminal history worksheet. The state shall

have the burden of producing further evidence to satisfy its burden of proof regarding any disputed part, or parts, of the criminal history and the sentencing judge shall allow the state reasonable time to produce such evidence to establish the disputed portion of the criminal history by a preponderance of the evidence.'

"Without an objection by Hatt, the PSI report was admitted and filed as a part of the record for No. 96 CR 209, and the trial court may take judicial notice of the report pursuant to K.S.A. 2000 Supp. 21-4714(f). Contrary to Hatt's arguments, these two statutory provisions are not in conflict. The trial court did not err in taking judicial notice of Hatt's previously filed PSI report instead of requiring the State to produce evidence to establish the disputed portion of the criminal history by a preponderance of the evidence." *State v. Hatt*, 30 Kan. App. 2d 84, 86, 38 P.3d 738 (2002).

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned.