(324 P.3d 331)
No. 110,178

In the Matter of the Care and Treatment of WILLIAM N. QUARY.

Opinion filed May 9, 2014.

*Ian T. Otte*, of Herlocker, Roberts & Herlocker, L.L.C., of Winfield, for appellant.

*Christopher E. Smith*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., ATCHESON and BRUNS, JJ.

ATCHESON, J.: Respondent William N. Quary appeals the judgment of the Cowley County District Court involuntarily committing him as a sexually violent predator following a bench trial. Quary argues—correctly in our view—that the district court improperly handled evidence the State offered through a pair of psychological experts. First, Quary contends the district court should not have considered otherwise inadmissible information the experts relied upon in reaching their conclusions as substantive evidence supporting the State's case. Second, he contends the expert

reports themselves should not have been admitted as evidence over his objection and reviewed by the district court as the finder of fact. But the errors are harmless because ample evidence properly considered and admitted supports the judgment, including Quary's admissions and court records from his juvenile adjudications and criminal prosecutions. We, therefore, affirm.

The issues before us present comparatively narrow, interlocking evidentiary questions. We, therefore, dispense with a general narrative of the factual renditions the State and Quary presented during the trial. We discuss particular aspects of the record evidence as they bear on the points on appeal.

## I. SEXUALLY VIOLENT PREDATOR ACT: GENERAL PRECEPTS AND EXPERT TESTIMONY

*Statutory Provisions*

Under the Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.*, a person may be indefinitely committed for treatment to a secured facility on the grounds of the Larned State Hospital. The State must prove the individual: (1) has been convicted of or charged with a crime designated as a sexually violent offense; (2) has a mental abnormality or personality disorder; (3) is likely to commit an act of sexual violence because of that abnormality or disorder; and (4) displays serious difficulty controlling his or her dangerous behavior. *In re Care & Treatment of Williams*, 292 Kan. 96, Syl. ¶ 3, 253 P.3d 327 (2011); see K.S.A. 2013 Supp. 59-29a02(a). Although a commitment action is civil rather than criminal, a respondent receives a broad range of procedural protections. The State must prove the required elements beyond a reasonable doubt. K.S.A. 2013 Supp. 59-29a07(a). The respondent has the right to legal representation, to cross-examine witnesses, and to present evidence. K.S.A. 2013 Supp. 59-29a06; *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 25, 40-42, 287 P.3d 855 (2012) (right to counsel; reversing commitment and remanding under Act where counsel for respondent was ineffective in challenging State's evidence); *In re Care & Treatment of Chadwick*, No. 104,500, 2011 WL 3795483, at *4 (Kan. App. 2011) (unpublished opinion) (acknowledging respondent in commitment proceeding under the Act

must be afforded an "opportunity to challenge the State's evidence [and] present evidence of his own"). The respondent may request a jury trial. K.S.A. 2013 Supp. 59-29a06. If adjudged a sexually violent predator, the respondent has the right to appeal that determination. K.S.A. 2013 Supp. 59-29a07(a).

The Kansas rules of evidence generally govern proceedings under the Act. See K.S.A. 60-402 (rules "apply in every proceeding, both criminal and civil, conducted by . . . a court in which evidence is produced" unless otherwise provided in a "statute applicable to the specific situation"). Particularly pertinent here, however, the Act modifies the way expert testimony may be presented and received as evidence during commitment proceedings. K.S.A. 2013 Supp. 59-29a06(c). By its express terms, K.S.A. 2013 Supp. 59-29a06(c) rejects K.S.A. 60-456(b), the evidence rule governing expert testimony, to expand the sources of information experts may use in forming their opinions. In material part, K.S.A. 2013 Supp. 59-29a06(c) states:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts and data need not be admissible in evidence in order for the opinion or inference to be admitted."

That language is drawn almost verbatim from the version of Federal Rule of Evidence 703 in effect until 2011. (The Federal Rules of Evidence were redrafted in 2011 to make them more comprehensible without altering their substantive effect. See Fed. R. Evid. 703 advisory committee note, 2011 Amendments. Accordingly, federal caselaw is instructive on how K.S.A. 2013 Supp. 59-29a06(c) should be construed. See *State v. Prine*, 297 Kan. 460, 476-77, 303 P.3d 662 (2013) (court looks to federal authority construing Fed. R. Evid. 413 and 414 to apply comparable provision added to K.S.A. 60-455); *State v. Miller*, 284 Kan. 682, 690, 163 P.3d 267 (2007) (court reviews federal cases under Fed. R. Evid. 403 to construe similar language in K.S.A. 60-445); *cf. In re Patterson*, No. 107,232, 2013 WL 2395313, at *10 (Kan. App. 2013)

(unpublished opinion) (noting Fed. R. Evid. 703 to be "nearly identical" to K.S.A. 59-29a06(c)).

*The State's Expert Evidence*

Given the issues to be decided in a sexually violent predator commitment action, expert testimony commonly forms the backbone of the State's case. The proceeding against Quary fits that pattern. Everyone agrees Quary has been convicted of a sexually violent crime. The State relied on the expert opinions of Dr. Jane Kohrs, a forensic psychologist employed by a private company providing services to the Department of Corrections, and Dr. Stephanie Adam, a psychologist at Larned State Hospital. Both experts found Quary to have psychological defects satisfying the criteria for commitment under the Act. Each expert prepared a detailed written report outlining the salient historical information on which she relied and the relevant clinical conclusions she reached about Quary. Dr. Kohrs and Dr. Adam separately interviewed Quary as part of their clinical assessments of him. In those interviews, they gathered historical information from Quary and formed diagnostic impressions of him. They also reviewed court records, files from the Department of Corrections, and other documents in arriving at their expert opinions.

Quary opted to have the district court, rather than a jury, decide the case. During the trial, the State offered as exhibits the reports of Dr. Kohrs and Dr. Adam and the documentary materials upon which they relied. Quary's lawyer objected on the grounds that the reports and documents were or contained inadmissible hearsay. The district court overruled the objection and admitted the reports and documents as evidence. On direct examination, the expert witnesses testified briefly and in general terms confirming the findings in their respective reports. Quary's lawyer cross-examined them. The State called another witness and presented additional evidence. Quary testified but offered no countering experts or other witnesses. The district court found Quary to be a sexually violent predator under the Act and involuntarily committed him to the treatment program at Larned State Hospital. Quary has timely appealed that judgment.

## II. Standard of Review

The points on appeal address the admission and use of evidence—information on which the State's experts relied in forming their opinions and their reports outlining both that information and their conclusions—despite a contemporaneous hearsay objection from Quary. Relevance and materiality are undisputed, so those considerations do not shape our review. See *State v. Berriozabal,* 291 Kan. 568, 586, 243 P.3d 352 (2010) (an appellate court reviews de novo a contested determination of materiality); *Wendt v. University of Kansas Med. Center,* 274 Kan. 966, 975, 59 P.3d 325 (2002) (admission or exclusion of otherwise material evidence largely rests in district court's sound discretion). The district court's admission of evidence challenged as hearsay is subject to appellate review for abuse of discretion. See *State v. James,* 48 Kan. App. 2d 310, 323, 288 P.3d 504 (2012); *Brick Masters, Inc. v. Murray & Sons Constr. Co.,* No. 107,426, 2013 WL 1729249, at *2 (Kan. App. 2013) (unpublished opinion).

A district court may be said to have abused its discretion if the result it reaches is "arbitrary, fanciful, or unreasonable." *Unruh v. Purina Mills,* 289 Kan. 1185, 1202, 221 P.3d 1130 (2009). That is, no reasonable judicial officer would have come to the same conclusion if presented with the same record evidence. An abuse of discretion may also occur if the court fails to consider or to properly apply controlling legal standards. *State v. Woodward,* 288 Kan. 297, 299, 202 P.3d 15 (2009). A district court errs in that way when its decision " 'goes outside the framework of or fails to properly consider statutory limitations or legal standards.' " 288 Kan. at 299 (quoting *State v. Shopteese,* 283 Kan. 331, 340, 153 P.3d 1208 [2007]). Finally, a district court may abuse its discretion if a factual predicate necessary for the challenged judicial decision lacks substantial support in the record. *State v. Ward,* 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (outlining all three bases for an abuse of discretion).

In this case, the district court's treatment of the information on which Dr. Kohrs and Dr. Adam relied turns on the proper interpretation of K.S.A. 2013 Supp. 59-29a06(c). And its admission of

their reports similarly involves a more general application of the rules of evidence. Any abuse of discretion arose from a misunderstanding of the governing legal principles. The points, then, really depend upon how K.S.A. 2013 Supp. 59-29a06(c) and the evidence rules should be read, thus forming the applicable legal standards. That presents a question of statutory construction. So we ought to review that much of the district court's decisionmaking without any particular deference. *State v. Marks*, 297 Kan. 131, 142, 298 P.3d 1102 (2013) (adequacy of legal basis for admitting evidence reviewed de novo, although other bases for admission or exclusion should be tested for abuse of discretion); *Unruh*, 289 Kan. at 1193 ("Interpretation of a statute is a question of law over which [an appellate] court has unlimited review.").

### III. Foundation for and Admissibility of Expert Opinions

*Statute Permits Experts to Rely on Inadmissible Information*

Under K.S.A. 2013 Supp. 59-29a06(c), expert witnesses testifying at a commitment proceeding may base their opinions on hearsay or other inadmissible information if that material is of the sort reasonably relied upon by professionals in their field. The plain language of the statute says as much. The federal courts have consistently construed Fed. R. Evid. 703 that way. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 523-24 (5th Cir. 2013); *United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010). And that construction of Fed. R. Evid. 703 is one of long standing. See *United States v. Affleck*, 776 F.2d 1451, 1456-57 (10th Cir. 1985); 4 Weinstein's Federal Evidence § 703.05[1] (2d ed. 2014). But otherwise inadmissible information on which an expert relies in forming his or her opinion may not be admitted as substantive evidence because of that reliance. *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221, 2239-40, 183 L. Ed. 2d 89 (2012) (plurality opinion); *United States v. Pablo*, 696 F.3d 1280, 1287-88 (10th Cir. 2012); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 246-47 & n.14 (3d Cir. 2008); *Affleck*, 776 F.2d at 1457; 4 Weinstein's Federal Evidence § 703.05[2]. In other words, the information lacks an independent evidentiary foundation to be admitted and considered for its truth

and, thus, as substantive evidence bearing on the ultimate legal issues. So a factfinder could not rely on that information—in contrast to the expert opinion itself—to support a verdict or judgment.

But a factfinder may consider the inadmissible information to assess the worth of the expert opinion. If the foundational information reasonably supports the expert witness' conclusions, the finder of fact may favorably consider those conclusions in deciding the controlling issues. Conversely, should the information fail to logically bolster the expert's reasoning, the finder of fact may discount or discard those opinions as unworthy of belief. In that way, a factfinder may distinguish among experts offering conflicting conclusions by looking at the strength of the underlying information and its reasoned connection to those conclusions. See *Williams*, 132 S. Ct. at 2256 (Thomas, J., concurring) (the information on which an expert relies may be considered under Fed. R. Evid. 703 " 'only for the purpose of assisting the jury in evaluating an expert's opinion' ") (quoting Fed. R. Evid. 703 advisory committee note, 2000 Amendments); *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1153 (10th Cir. 1990) (inadmissible information or data may be "admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted" in that material); see also Fed. R. Evid. 703 advisory committee note, 2000 Amendments ("trial court . . . must consider the information's probative value in assisting the jury to weigh the expert's opinion . . . and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes").

The Kansas Supreme Court recognized that construction of Fed. R. Evid. 703 in *State v. Gonzalez*, 282 Kan. 73, 87-88, 145 P.3d 18 (2006), while contrasting the federal rule with expert testimony properly admitted under K.S.A. 60-456(b). The court noted Fed. R. Evid. 703 allows an expert to base his or her opinion on what would be inadmissible hearsay if the use of that information were "the customary practice in the expert's specialty." 282 Kan. at 88. The information, however, may "not [be] admitted as substantive proof . . . but for the limited purpose of showing the basis of the expert's opinion." 282 Kan. at 88. We have no reason to believe

the Kansas Supreme Court would impose some different interpretation on K.S.A. 2013 Supp. 59-29a06(c), given its operative language borrowed directly from Fed. R. Evid. 703.[1]

[1]Under K.S.A. 60-456(b), an expert testifying at trial must offer an opinion "based on facts or data perceived by or personally known or made known to the witness at the hearing." That generally requires documents upon which an expert relies to be admitted into evidence. *Gonzalez*, 282 Kan. at 88. If the expert relies on other facts, he or she must have firsthand knowledge of them or be apprised of them by hearing witnesses testify to them at trial or by responding to a hypothetical question incorporating trial testimony. See *Smith v. Estate of Hall*, 215 Kan. 262, 265, 524 P.2d 684 (1974); *Staudinger v. Sooner Pipe & Supply Corporation*, 208 Kan. 100, 106, 490 P.2d 619 (1971); *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 549-50, 431 P.2d 518 (1967). The limitations of K.S.A. 60-456(b) impose horse-and-buggy constraints on the bases for expert testimony in a supersonic age. See *Clifford v. United States*, 532 A.2d 628, 632-34 (D.C. 1987) (noting traditional methods of admitting expert testimony by requiring introduction of independent evidence of supporting facts or by posing hypothetical questions to be inefficient and open to abuse); *Hickman v. Branson Ear, Nose & Throat, Inc.*, 256 S.W.3d 120, 122-23 (Mo. 2008) (noting salutary statutory change eliminating requirement that expert testimony be elicited through hypothetical questions, rendering trial presentations "simpler, more direct, and less formulaic"); 4 Weinstein's Federal Evidence § 703.05[1] ("Rule 703's broadening of the permissible bases of expert opinion testimony . . . bring[s] the practice in the courts in line with the practice of the experts themselves when they are not in court."). We perceive experienced trial lawyers often tacitly agree to refashion those constraints into something more nearly resembling Fed. R. Evid. 703 in actual practice.

*District Court Misapplied Information Used by State's Experts*

Here, the district court's factual findings pronounced from the bench appear to treat inadmissible information contained in the expert reports and the supporting documents as substantive evi-

dence favoring the commitment of Quary. For example, the district court said it relied both on notes made by staff members who observed Quary at Larned State Hospital as he was undergoing evaluation and on reports of rules violations at various institutions where Quary had been detained. As to most of the particular findings, the district court identified multiple sources of the information on which it relied, including Quary's statements during the clinical interviews with Dr. Kohrs and Dr. Adam. The district court sought to corroborate the experts' conclusions by citing particular incidents recounted in the documents the experts reviewed. In doing so, the district court correctly considered that information to test the worth of the expert opinions. In other words, that information tended to validate the expert testimony. But the district court also appeared to use those incidents to bolster its own legal determination that the State had proven Quary to be a sexually violent predator properly committed under the Act. To that extent, the district court improperly used the documents and the information in them as substantive evidence supporting the legal findings necessary for commitment. In doing so, the district court erred.

The journal entry did not clarify the district court's factual findings. The journal entry simply recited generically that evidence was received at trial, made the requisite statutory findings under the Act, and ordered Quary involuntarily committed as a sexually violent predator.

*District Court's Error Was Harmless*

Based on the record evidence and the district court's findings, we conclude any error in the use of the expert evidence to be harmless. Properly admitted evidence firmly established the statutory requirements for Quary's involuntary commitment. As we noted, Quary has been convicted of a sexually violent offense. The expert opinions of Dr. Kohrs and Dr. Adam effectively demonstrate the remaining elements of Quary's mental abnormality or personality disorder, his likelihood of committing new acts of sexual violence, and his difficulty in controlling his behavior. Those expert opinions were unrebutted in the sense Quary offered no counter-

vailing opinions from mental health professionals. In the clinical interviews with Dr. Kohrs and Dr. Adam and in his trial testimony, Quary admitted and sought to defuse some of the sexually predatory and violent conduct in his past. The district court properly relied on those admissions to bolster its factual findings and legal conclusions.

The admissible evidence, particularly in the form of the expert testimony and Quary's own statements, furnished more than sufficient evidence to warrant the district court's ultimate determination. The weight of the admissible evidence favoring the State's position was overwhelming, and the district court viewed it that way. The district court neither suggested the case was a close one nor pointed to any significant evidence favoring Quary's position. The district court acknowledged that Quary testified that he has reformed and would no longer engage in antisocial, sexually motivated behavior. The district court found the expert testimony to the contrary compelling.

In addition, the district court cited testimony the State presented from Capt. Janet Gardner, a supervisor at the Cowley County jail, concerning an incident involving Quary about 3 months before the trial while he was being held in the jail. Capt. Gardner responded to a request from a jailer during the facility's 11 p.m. lockdown. She found Quary visibly angry and refusing to comply with the customary lockdown procedure. When Capt. Gardner directed him to comply, Quary shook with rage and called her a "fucking bitch." According to Capt. Gardner, as Quary began to comply, he turned toward her, grabbed his crotch, and shouted, "Suck my dick." The district court credited Capt. Gardner's testimony and found the incident undercut Quary's representation that he had successfully curbed his antisocial behavior. For our purposes, that finding is significant because Capt. Gardner testified at the commitment trial, thus providing substantive evidence of the confrontation and Quary's behavior.

In sum, given the weighty evidence properly admitted and considered supporting the district court's judgment committing Quary under the Act, the misapplication of some of the information on which the experts relied as substantive evidence amounted to

harmless error. We find Quary's substantial rights were not compromised, and we are convinced the district court would have reached the same conclusion had the record evidence been considered in perfect fashion. See K.S.A. 2013 Supp. 60-261; *State v. Torres*, 294 Kan. 135, 143-44, 273 P.3d 729 (2012).[2]

[2]The district court's treatment of the information upon which Dr. Kohrs and Dr. Adam relied illustrates the subtle difference between the proper use of that material under K.S.A. 2013 Supp. 59-29a06(c) and its impermissible use as substantive evidence. The distinction is particularly problematic in jury trials, since jurors may have a difficult time separating the two and confining their consideration of the information to assessing the strength of the expert's opinion. We needn't plumb that aspect of K.S.A. 2013 Supp. 59-29a06(c) here because the case was tried to the district court. The drafters of Fed. R. Evid. 703 would typically prohibit the party calling an expert from detailing the inadmissible information underlying the witness' opinions absent a ruling from the district court that the probative value outweighed the prejudicial impact. If that information were admitted, the authors of the rule would then require a limiting instruction on its use, if requested by the opposing party. See Fed. R. Evid. 703; Fed. R. Evid. 703 advisory committee note, 2000 Amendments.

*State Fails to Show Independent Hearsay Exceptions for Information*

On appeal, the State offered two arguments for treating various records and other documents on which Dr. Kohrs and Dr. Adam relied as substantive evidence the district court could have used to find Quary a sexually violent predator. We find neither to be persuasive.

Initially, the State says the underlying documents were authenticated as business records, as provided in K.S.A. 2013 Supp. 60-460(m), and, therefore, constituted admissible hearsay. But that proposition fails in two ways. First, the State relied on affidavits of the custodians of the records from both the Department of Corrections and Larned Hospital submitted with the documents in response to subpoenas issued under K.S.A. 2013 Supp. 60-245a.

But K.S.A. 2013 Supp. 60-245a and the use of custodian affidavits as a prima facie basis to admit the subpoenaed documents as business records, as permitted in K.S.A. 2013 Supp. 60-460(m), apply only to nonparties. Here, the subpoenas were issued to agencies of the State, and the State is a party to this action. The procedures of K.S.A. 2013 Supp. 60-245a, therefore, are inapplicable.

Second, the affidavits would, at most, provide a foundation for the records themselves. But they would not have established a sufficient foundation for third-party hearsay statements reported in those records. See *In re N.D.G.*, 20 Kan. App. 2d 17, 24, 883 P.2d 89, *rev. denied* 256 Kan. 995 (1994) (hearsay statements in hospital records must satisfy hearsay exception independent of business records exception to be admitted as evidence); *State v. Davis*, 2 Kan. App. 2d 698, 698-99, 587 P.2d 3 (1978), *rev. denied* 225 Kan. 846 (1979). The State would have to establish that the individuals making the statements reported in the documents were under some duty to do so, thereby satisfying the business records hearsay exception. K.S.A. 2013 Supp. 60-460(m) (sources of information in business records must "indicate their trustworthiness"); *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008) (trustworthiness of business records rests on supposition that " 'each actor in the chain of information is under a business duty or compulsion to provide accurate information' ") (quoting *United States v. McIntyre*, 997 F.2d 687, 699 [10th Cir. 1993]). Or the State would have to lay a foundation demonstrating another exception to admit that second level of hearsay as substantive evidence. *In re N.D.G.*, 20 Kan. App. 2d at 24; *Ary*, 518 F.3d at 787 (information in business record provided by an outsider to the business "must also fall within a hearsay exception to be admissible").

The State alternatively suggests the documents could be admitted as "official records" under K.S.A. 2013 Supp. 60-460(o). That hearsay exception applies to an authenticated copy "of an official record or of an entry therein." K.S.A. 2013 Supp. 60-460(o)(1). The term "official record" is not, however, defined in the rules of evidence. A survey of Kansas caselaw applying the exception demonstrates the documents must be prepared or compiled and then maintained by a government agency pursuant to a specific duty or

function of the office. See *State v. Hobbs*, 276 Kan. 44, 52-53, 71 P.3d 1140 (2003) (county coroner's formal report of death considered official record under K.S.A. 60-460(o)); *State v. Bishop*, 264 Kan. 717, 726-27, 957 P.2d 369 (1998) (monthly certification of Intoxilyzer 5000 breath test machine and certification of calibration solution official records); *State v. Baker*, 237 Kan. 54, Syl. ¶ 1, 697 P.2d 1267 (1985) (attested copy of journal entry from Kansas court official record); *City of Overland Park v. Rice*, 222 Kan. 693, 698-99, 567 P.2d 1382 (1977) (order of suspension of driving privileges by division of vehicles official record); *State v. Kliewer*, 210 Kan. 820, 824-25, 504 P.2d 580 (1972) (motor vehicle title official record); *Ballhorst v. Hahner-Foreman-Cale, Inc.*, 207 Kan. 89, 96, 484 P.2d 38 (1971) (report of daily weather conditions prepared by United States Weather Bureau at Great Bend Airport official record). Although the documents needn't be public records as such, they may be characterized as integral to a discrete agency task undertaken on a regular or routine basis. The clinical records and the Department of Corrections file, including disciplinary actions, related to Quary are not of that type. They contain detailed factual narratives about a variety of events related to him, rather than the focused and particularized information or data contained in official records—such as meteorological conditions on a given day in a given place or the certification of a specific Intoxilyzer for a particular month. Even if the records themselves satisfied K.S.A. 2013 Supp. 60-460(o), many of the narrative accounts would present double-hearsay problems, as we discussed with the business records exception.[3]

[3]The official records exception in K.S.A. 2013 Supp. 60-460(o) has no direct analog in the Federal Rules of Evidence. The exception for "public records" in Fed. R. Evid. 803(8) is considerably broader, and the exception for "public records of vital statistics" in Fed. R. Evid. 803(9) is considerably narrower.

## IV. ADMISSIBILITY OF EXPERT REPORTS

We turn now to Quary's second point challenging the admissibility of the written reports of Dr. Kohrs and Dr. Adam as evidence. In civil cases, experts designated as trial witnesses commonly pre-

pare written reports outlining their conclusions and the factual information on which they rely in reaching those conclusions. See K.S.A. 2013 Supp. 60-226(b)(6)(A)(ii) (requiring party to disclose the identity of any expert witness who may be called at trial and to furnish "the substance of the facts and opinions to which the expert is expected to testify"). The reports from Dr. Kohrs and Dr. Adam contain what looks to be inadmissible hearsay. Dr. Adam's 17-page, single-spaced report includes detailed descriptions of Quary's medical treatment, criminal offenses, and sexual history without identifying the specific sources of information. Dr. Adam also cites incidents reported in progress notes or other documents from various institutions where Quary had been held. Those documents often do not identify the persons recounting the events or whether those individuals even had firsthand knowledge of the circumstances. So in Dr. Adam's report, some of the information seems to rest on several layers of hearsay without an evidentiary foundation for admissibility. Dr. Kohrs' 11-page report similarly cites other documents containing or summarizing events and incidents recounted by various unidentified sources who may or may not have had firsthand knowledge.

Because the expert reports themselves included inadmissible hearsay, they should not have been admitted over Quary's objection, absent some additional foundation negating the objection. An expert report cannot serve as a device to smuggle otherwise inadmissible evidence into a case anymore than expert testimony can. An expert report certainly may be marked for identification and made part of the trial record, especially if a party refers to the report in examining the expert or other witnesses. The error here, however, is functionally no more prejudicial than the district court's consideration of the inadmissible information relied upon by the experts as substantive evidence. Because we have already found that mistake to be harmless, we reach the same conclusion as to the reports.

More broadly, however, the party calling an expert witness typically should not be permitted to admit the expert's report as an exhibit provided to the factfinder for consideration during deliberation of a case absent a stipulation. The reports are unlike phys-

ical objects or documentary evidence admitted at trial—exhibits that customarily go into the jury room. See *State v. Grauerholz*, 232 Kan. 221, 224, 654 P.2d 395 (1982) (noting the "normal practice" of providing exhibits to jurors at the start of deliberations). Those objects and documents figure in the historical factual circumstances giving rise to the legal dispute. That's what makes them relevant in the first place. But expert reports are created during the litigation, long after the operative events.

Expert reports essentially reflect a tailored narrative of facts that may be disputed in the trial evidence and a carefully constructed version of the witness' opinions presented at trial. See *United States v. Lozada-Rivera*, 177 F.3d 98, 105 (1st Cir. 1999) (report of DEA case agent amounted to a " 'condensation of the government's whole case against the defendant' " and was erroneously admitted as an exhibit and given to jury during deliberations) (quoting *United States v. Quinto*, 582 F.2d 224, 236 [2d Cir. 1978]). Those expert reports serve reasonably well as a discovery tool. But the benefits do not carry over to admitting the reports at trial. First, of course, a report would either duplicate the expert's trial testimony, making it cumulative, or it would add information and opinions, making it improper. Moreover, in a jury case, the prejudicial impact of allowing expert reports into the jury room as trial exhibits commonly would far outweigh any probative value. See *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 730 n.2 (6th Cir. 1994); *Law v. National Collegiate Athletic Ass'n*, 185 F.R.D. 324, 342 (D. Kan. 1999) ("[I]n most cases, expert reports do not go to the jury in any format" and doing otherwise "may call undue attention to the expert's trial testimony."); *McAtee v. Com.*, 413 S.W.3d 608, 623 (Ky. 2013) (recognizing that expert witness reports should not be sent to the jury room during deliberations); *Davolt v. Highland*, 119 S.W.3d 118, 135-37 (Mo. App. 2003) (error to provide expert opinion letters to jury, but no manifest injustice amounting to plain error and not otherwise reviewable in absence of contemporaneous objection). In effect, the expert witness, through his or her report, would accompany the jurors during their deliberations. No other witnesses get to have written summaries of their trial testimony considered in that way during deliberations.

So jurors could be prompted to give undue attention and weight to expert witnesses.

Even so, we find no prejudicial error here because the case was tried to the district court rather than to a jury. District court judges typically would not be unduly influenced by reviewing expert reports during their consideration of the evidence in arriving at a decision. See *Redondo v. Gomez*, No. 109,642, 2014 WL 802268, at *2 (Kan. App. 2014) (unpublished opinion) ("Judges are not susceptible to the same sort of undue influence that sharp practices may induce in jurors."); *United States v. Stinefast*, 724 F.3d 925, 931 (7th Cir. 2013) ("Judges often hear improper argument and other forms of inadmissible evidence that they are presumed to disregard when deciding matters of importance."); *State v. Jackson*, 248 S.W.3d 117, 125 (Mo. App. 2008); 4 Weinstein's Federal Evidence § 703.05[2]. We find nothing in the record to suggest the district court was impermissibly swayed because it physically had copies of the expert reports while contemplating how to rule. As we have found, there was ample evidence, much of it from Quary himself, to support the district court's judgment.[4]

[4]We also do not mean to suggest that in a given case, the parties would be prohibited from stipulating to the admissibility of expert witness reports and their submission to the finder of fact—either a district court or a jury—during deliberations. By mutual agreement and with the consent of the district court, the parties may substantially modify the rules of evidence to admit information that otherwise would be inadmissible or to waive formal foundation for exhibits. The parties might decide to rely on expert witness reports as the most efficient and economical way to get that evidence before the finder of fact, particularly in a bench trial. See K.S.A. 2013 Supp. 60-102 (Code of Civil Procedure including rules of evidence to be "administered to secure the just, speedy and inexpensive determination of every action"). Here, however, Quary explicitly objected to the admission of the expert reports. Nor do we suggest that the party opposing a testifying expert witness should be foreclosed from admitting the expert's report for the factfinder's review if that party perceives some benefit and the report is more probative than prejudicial. In that context, the re-

port may stand much as an admission by an agent of a party opponent. See *Durham v. County of Maui*, 804 F. Supp. 2d 1068, 1071 (D. Hawaii 2011) (expert witnesses testifying at trial considered authorized to speak on behalf of parties calling them); *Samaritan Health Center v. Simplicity Health Care*, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006).

## V. CONCLUSION

Under K.S.A. 2013 Supp. 59-29a06(c), expert witnesses may rely on inadmissible information in formulating their opinions. But district courts and juries cannot treat that information as substantive evidence. Likewise, reports from expert witnesses typically should not be admitted as evidence for the factfinder's consideration during deliberations. Given the overwhelming admissible evidence supporting the district court's judgment finding Quary to be a sexually violent predator and involuntarily committing him for treatment, any errors of that sort related to the State's expert testimony were harmless.

Affirmed.