20 Kan. App. 2d 17 (1994)
In the Interest of N.D.G., a minor child, DOB 7-28-84, and J.J.G., a minor child, DOB 1-18-86.
No. 70,750
Court of Appeals of Kansas.
Opinion filed October 14, 1994.
Shannon S. Crane, of Hutchinson-Reno County Legal Services, of Hutchinson, for the appellant natural mother.
Sheila J. Floodman, of Alexander, Floodman & Casey, Chartered, of Wichita, and Matthew B. Works, of Works, Works & Works, of Topeka, for the appellees adoptive father and maternal grandmother.
*18 Before LEWIS, P.J., RULON, J., and TERRY L. BULLOCK, District Judge, assigned.
LEWIS, J.:
J.G. is the natural mother of N.D.G., who was born, July 28, 1984, and J.J.G., who was born January 18, 1986. J.R. is the adoptive father of the children and also the uncle of J.G. D.G. is the mother of J.G. and the grandmother of the two children. D.G. maintains the physical custody of N.D.G., while J.J.G. is in the physical custody of J.R. J.R. and D.G. both instituted actions under the Kansas Code for Care of Children (KCCC), K.S.A. 38-1501 et seq., which resulted in the termination of the parental rights of J.G. J.G. appeals from that decision.
D.G. filed a child in need of care petition on behalf of each child in the district court of Shawnee County. Approximately two months later, J.R. filed separate petitions on behalf of each child, seeking to terminate the parental rights of J.G. Ultimately, the trial court permitted the pleadings to be amended to request that the children be found in need of care and that J.G.'s parental rights be severed. Venue was transferred to Finney County. The cases were consolidated for trial and, after trial, the trial court entered its order, finding the children to be in need of care and terminating J.G.'s parental rights.
The record reflects a turbulent and unhappy family history. J.G. has been married four times; the two children were born as a result of her first marriage.
J.G. maintained custody of N.D.G. from birth to the age of two years. J.G. then divorced the father of N.D.G., who was awarded custody of the child. In March 1987, N.D.G. returned to live with J.G.
J.J.G. was born prematurely and spent the first four or five weeks of his life in the hospital. He was with his mother less than four months when he was removed from her care by SRS. At that time, he had lesions on his head, cuts or burns on four toes, and a diaper rash that was so severe his skin was hard in some places and raw in most.
L.F. is the wife of J.R. J.J.G. was placed in the custody of L.F. until late 1987, when he was again placed in the care of J.G.
*19 For a period of time, the children alternated between the home of J.G., the home of J.R. and L.F., and the home of D.G. In April 1988, J.J.G. returned to live with J.R. and L.F., while N.D.G. moved to the home of D.G. The children have remained in these homes since that time with the exception of occasional visits with their mother.
Throughout the years, J.G.'s lifestyle has appeared incompatible with providing a fit environment for her children. Her domestic relationships have, for the most part, been abusive and turbulent. Her most recent husband is identified as N.R.J.G. has filed at least three protection from abuse cases against N.R. and failed to appear or otherwise pursue any of those cases. J.G. has attempted suicide on at least two occasions. From January 3, 1991, to May 19, 1993, she has been involved in at least 11 documented police investigations, ranging from a complaint that one of her male friends threw a cocaine scale at her to a report that she had threatened to kill a female friend of N.R. There was testimony of cocaine use by J.G. as recently as April 1993. J.G.'s parental rights were severed in July 1993.
In 1989, J.R. adopted N.D.G. and J.J.G. During the adoption proceedings, it was understood and stipulated that J.R. would be the resident custodial parent until further agreement of the parties or order by the court. J.R. has remained the resident custodial parent since the time of the adoption decree. However, it is undisputed that N.D.G. primarily resides with her grandmother, while J.J.G. resides with J.R.
In 1991, J.G. was given visitation rights with her children. This visit lasted for approximately eight days, three of which were spent by the children with a neighbor. The children reported that J.G. had locked them out of her house; they were hungry and unfed. The evidence indicates that J.G. did not check on the welfare of her children during their three days with the neighbor.
J.G. has had the children in her care for three months in 1988, eight days in 1991, and intermittently at other times, never for longer than two days. At the time of trial, May 1993, J.G. had not visited her children since before Easter 1992.
*20 J.G., at this time, advises through her attorney that she was satisfied with the situation prior to her parental rights being terminated. She does not want custody of her children and is agreeable to N.D.G. continuing to live with D.G. and J.J.G. continuing to live with J.R. She is agreeable to J.R. being the principal custodial parent and does not desire to change that status. It is apparent that J.G. does not want her parental rights severed, while at the same time, she shows no real desire to raise and care for her two children.
After the unsettling visit in 1991, the two children were admitted to Parkview Hospital of Topeka (Parkview) for an evaluation. The results of that evaluation are not favorable to J.G.
Dr. Jeff Lane, a forensic psychologist, testified at the hearing pursuant to court order. He described J.G. as hostile, resentful, emotionally unstable, egocentric, and impulsive with a "low tolerance for frustration." He further testified that J.G. is "immature, ... self-indulgent, insensitive to others and suspicious." He initially recommended that the parental rights of J.G. be altered but not severed. He later revised his opinion and testified that severance was perhaps the only possible avenue in the best interests of the children.
CASA was involved in this parental severance action and filed its report, recommending severance of the parental rights of J.G.
At the time of trial, both children were apparently living normal, happy lives. J.J.G. was doing well in school, attending church and Sunday school, and participating in a scouting group. N.D.G. was active and doing well in school.
STANDARD OF REVIEW
The standard of review in a case of this nature is whether there is substantial competent evidence in the record to support the trial court's decision that the parent was unfit and that the parental rights should be terminated. In re S.M.Q., 247 Kan. 231, Syl. ¶ 1, 796 P.2d 543 (1990). "An appellate court must not reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. It must review the evidence in the light most favorable to the party prevailing below." 247 Kan. at 234.
*21 The parent must be found "unfit" by the trial court before parental rights may be severed. K.S.A. 38-1583; In re M.M., 19 Kan. App.2d 600, Syl. ¶ 2, 873 P.2d 1371 (1994). Proof of unfitness must be by clear and convincing evidence. 19 Kan. App.2d 600, Syl. ¶ 3. "The term `unfit' is defined to include inherent mental and emotional incapacity to perform parental obligations which can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child." In re M.D.S., 16 Kan. App.2d 505, Syl. ¶ 1, 825 P.2d 1155 (1992).
"The difficult question of termination turns on two questions: (1) determining whether the child can be returned to the parent within a reasonable time, and (2) determining whether the termination of parental rights is in the child's best interests." In re S.M.Q., 247 Kan. at 232. The physical, mental, or emotional condition and needs of the children are the primary considerations in cases of this nature. K.S.A. 38-1583(e).
PROCEDURAL PROBLEMS
The facts make this action somewhat unique as a "child in need of care" case. In this case, one parent, albeit an adoptive parent, seeks to sever the parental rights of the other parent, the natural mother. Even more unique is the fact that the adoptive father of these children is the uncle of the natural mother. The parents of these children obviously are not married to one another and never have been. The other petitioner involved in this action is the maternal grandmother, who seeks to sever the parental ties of her daughter.
J.G. argues that one parent may not proceed against the other under the child in need of care statutes. She suggests that these statutes provide an inappropriate forum for what is essentially a custody battle between two parents. We disagree.
First of all, the instant matter is far more than a custody battle between two parents. The petitioners have indicated that they believe the best interests of the children rest in the severance of the parental rights of the mother of these children. They are not seeking to deny her custody or to regulate her visitation; they are seeking to sever her parental rights. This is considerably more serious than a custody dispute.
*22 Under the facts shown, no other forum or procedure was available to the parties. In the usual battle between two parents, the obvious forum for a custody dispute is the underlying divorce or separate maintenance action. There was no underlying divorce or separate maintenance action available to these parties. In this case, the parents are not married and never have been but are related as uncle and niece.
J.R. adopted these children. J.G. suggests that the adoption action provides a forum for the custody dispute. The adoption action, however, is long closed, and we know of no method to reopen it to litigate the question of the fitness of the natural mother. We do not suggest that, in appropriate cases, an adoption court could not sever parental rights. Such a remedy is available in adoption cases under our code under certain proven facts. Under the facts with which we deal, however, there is no method to reopen this matter under the adoption statutes.
J.G. argues that since her children were adopted by J.R., severance of her parental rights is controlled by K.S.A. 59-2102, which allowed termination of parental rights of a parent who has failed to assume the duties of a parent for two consecutive years. That statute was repealed in 1990 and is no longer applicable to cases of this nature. J.G.'s argument has no merit.
K.S.A. 38-1529(b) provides: "Any individual may file a petition alleging a child is a child in need of care and the individual may be represented by the individual's own attorney in the presentation of the case." (Emphasis added.)
K.S.A. 38-1581 specifically permits "any interested party" to request the termination of the parental rights of either or both parents "[e]ither in the petition filed under [the KCCC] or in a motion made in proceedings under this code."
"`Interested party' means the state, the petitioner, the child, any parent and any person found to be an interested party pursuant to K.S.A. 38-1541 and amendments thereto." (Emphasis added). K.S.A. 38-1502(e). J.R. is the adoptive parent of both N.D.G. and J.J.G.; D.G. is their grandmother and is the principal physical custodian of N.D.G.J.R. and D.G. are both interested parties and proper persons to petition the court to find the children *23 to be in need of care and to request that J.G.'s parental rights be terminated under the KCCC.
We hold that one parent may proceed against the other under the child in need of care statutes. It is apparent that the legislature has placed no limitation on who may be a petitioner in such an action as this as long as the petitioner is an "interested party." The petitioners in the instant matter are certainly interested parties and have a statutory right to bring the underlying action.
While we do not recommend the use of the KCCC to litigate custody disputes between two persons involved in a divorce action, we find no difficulty with the use of that forum under the facts shown. We hold that the forum provided by the KCCC was appropriate under the facts of this case and affirm the trial court's decision to proceed under those statutes.
WERE THE CHILDREN IN NEED OF CARE?
J.G. next argues that the facts do not warrant a finding that the children were "children in need of care."
In the purest sense of the term, these children were not "in need of care." They were both in stable, loving homes. Neither was being abused, mistreated, or going without the necessities of life when this action was filed. However, as the evidence developed, it became obvious that as to their mother, these children were, indeed, "in need of care."
The question is not purely whether the children are in need of care in the abstract use of that term. In this action, the focus is on how the children have been and will be cared for by J.G. If the evidence indicates that the children have been and will be in need of care if the relationship with their mother continues, they may be said to be children in need of care as that term is used in the KCCC.
In In re D.V., 17 Kan. App.2d 788, 793, 844 P.2d 752, rev. denied 252 Kan. 1092 (1993), we held that the statutory factors of K.S.A. 38-1583(b) and (c), except for (b)(6), account only for the conduct of the parent whose parental rights are at issue. The termination of the parent's rights or the finding that a child is a "child in need of care" depends upon the conduct of the parents *24 whose rights are in issue and not upon the conduct of the custodial parent or other person. The trial court in this case concluded that "[N.D.G.] and [J.J.G.], children less than 18 years of age, are children in need of care as the concept relates to their mother [J.G.]." That finding is consistent with our decision in In re D.V. and was clearly within the province of the trial court. See In re T.D.W., 18 Kan. App.2d 286, 288-89, 850 P.2d 947 (1993). We affirm the holding of the trial court that these children were, indeed, "children in need of care."
THE PARKVIEW HOSPITAL RECORDS
In 1991, N.D.G. and J.J.G. were admitted to Parkview Hospital of Topeka for evaluation. Parkview is essentially a psychiatric hospital, and the reason for the admission was the mental and emotional state of the children. The ultimate conclusion reached during their hospitalization was that both children were suffering from major depression. The recommendation of the "Parkview staff" supported termination of the parental rights of J.G.
The Parkview records were admitted by the trial court under the business records exception to the hearsay rule, K.S.A. 1993 Supp. 60-460(m). J.G. argues that the trial court erred in admitting the Parkview records because the records contained "hearsay within hearsay" and because J.G. had no opportunity to cross-examine those whose opinions were expressed within the records.
There is no merit to the double hearsay objection. In re Estate of Bernatzki, 204 Kan. 131, Syl. ¶ 4, 460 P.2d 527 (1969), held that hospital records were admissible pursuant to K.S.A. 1993 Supp. 60-460(m). The limitation for hearsay statements within this exception prevents hearsay within hearsay from being admitted. K.S.A. 60-463; State v. Davis, 2 Kan. App.2d 698, Syl. ¶ 1, 587 P.2d 3 (1978), rev. denied 225 Kan. 846 (1979). Hearsay statements included in a hospital record must fall within some other exception to be admissible. See 2 Kan. App.2d at 699.
J.G. fails to point out any portion of the hospital record relied upon by the district court that violates the double hearsay rule. She conveniently ignores the provisions of K.S.A. 1993 Supp. 60-460(l), *25 which is the hearsay exception for the statements of physical or mental condition of the declarant. Certainly, any statements made by the children to hospital personnel were for the purpose of treatment and fall within that hearsay exception. Also, any information conveyed by J.R., D.G., or L.F. falls within K.S.A. 1993 Supp. 60-460(a), as all were present, testified, and were subject to cross-examination at trial. We find no violation of the double hearsay rule within the Parkview records.
However, we conclude that K.S.A. 38-1583(e) does prohibit the admission of portions of the Parkview records and that the trial court erred in admitting all the records under K.S.A. 1993 Supp. 60-460(m). We also conclude that this error by the trial court was harmless error and does not require a reversal of the decision.
K.S.A. 38-1583(e) interjects an entirely new concept into the admission of hospital records under cases governed by the KCCC. That statute reads in part as follows:
"If presented to the court and subject to the provisions of K.S.A. 60-419, and amendments thereto, the court shall consider as evidence testimony from a person licensed to practice medicine and surgery, a licensed psychologist or a licensed social worker expressing an opinion relating to the physical, mental or emotional condition and needs of the child. The court shall consider any such testimony only if the licensed professional providing such testimony is subject to cross-examination." (Emphasis added.)
The statute quoted above, in our opinion, limits the admission of expert testimony, as defined, in cases under the KCCC, to testimony which is subject to cross-examination. An opinion contained in hospital or medical records is inadmissible in cases under the KCCC unless the individual expressing such opinion is available in court for cross-examination. This statute renders inadmissible evidence which has traditionally been admitted under the business records exception set forth in K.S.A. 1993 Supp. 60-460(m). However, we hasten to add that this evidentiary rule applies only in cases controlled by the KCCC. We believe the enactment of K.S.A. 38-1583(e) indicates a decision by the legislature to require that expert opinions rendered in cases under the KCCC be admissible only when the individual declaring that opinion is available for cross-examination. In the ordinary case where *26 the hospital records are admitted under K.S.A. 1993 Supp. 60-460(m), the hospital personnel whose opinions are expressed within the hospital records are not required to be made available for cross-examination.
The provisions of K.S.A. 38-1583(e) appear to render inadmissible evidence otherwise admissible under K.S.A. 1993 Supp. 60-460(m). The question is which statute controls. As a general rule, a specific statute controls over a general statute. Baumann v. Excel Industries, Inc., 17 Kan. App.2d 807, 812, 845 P.2d 65, rev. denied 252 Kan. 1091 (1993). In this context, 38-1583(e) is specific as to cases under the KCCC and is controlling in that context. It would have no application to actions not governed by that code.
We have examined rather carefully the Parkview records, and we find that there are portions of those records which contain expert medical opinions relating to the physical, mental, or emotional condition and needs of N.D.G. and J.J.G. The individuals who formed these opinions were not available for cross-examination. This opinion evidence should not have been admitted under K.S.A. 38-1583(e). We do not believe there is any useful distinction between the use of the term "evidence" and the use of the term "testimony." Whether the opinion sought to be admitted is oral testimony or a written opinion, it has the same effect. It is not logical to reason that an opinion is inadmissible as testimony unless subject to cross-examination but becomes admissible without cross-examination when it is in writing and part of a hospital record. In our opinion, the statute is designed to render inadmissible expert opinion on the mental or emotional state of children under the KCCC which is not subject to cross-examination. In our judgment, the statute applies whether that opinion is oral or written.
Certainly, those portions of the Parkview records under the sections headed "Discharge Diagnosis" and "Recommendation and Arrangements" contained inadmissible hearsay under 38-1583(e). These sections of the records contain expert medical opinion relating to the children's physical, mental, or emotional needs, and the individuals expressing those opinions were not *27 made available for cross-examination. That evidence should not have been admitted.
We have excised the offending materials from the evidence and from the findings of the trial court. We conclude that even without this evidence, the balance of the properly admitted evidence overwhelmingly supports the trial court's findings of fact and its decision to sever J.G.'s parental rights.
Our rendition of the facts set out earlier in this opinion is more detailed than is common in an action of this nature. We did so to demonstrate that the record contains considerable evidence of parental neglect, parental abuse, parental drug abuse, and a total failure by J.G. to conform her conduct to the best interests of the children. Further, there is substantial competent evidence on which to base a conclusion that J.G.'s conduct is unlikely to change in the future. The opinions expressed in the Parkview records are not required to support the decision to sever parental rights, and the admission of portions of that record was harmless error at best. See, e.g., Tamplin v. Star Lumber & Supply Co., 251 Kan. 300, Syl. ¶ 3, 836 P.2d 1102 (1992).
The trial court in this case wrote a lengthy memorandum opinion and made 37 findings of fact and 14 conclusions of law. We have examined those and compared them with the record, and we hold that all the trial court's findings of fact, with the exception of No. 13, are supported by substantial competent evidence. The only finding that appears to be based, at least in part, on the Parkview reports is finding No. 13. The 36 remaining findings of fact are sufficient in and of themselves to affirm the decision of the trial court. We also conclude that the trial court's conclusions of law are supported by its findings of fact.
We realize that our interpretation of K.S.A. 38-1583(e) will complicate cases tried under the KCCC. Every hospital record admitted will have to undergo careful examination to excise any expert opinion testimony that will not be subject to cross-examination prior to the admission of the record. The legislature has determined that the rights of parents to their children cannot be severed based upon expert medical or social worker opinions expressed on paper by absent witnesses. The simple way to live *28 with this new rule is to present such opinion testimony live from the witness stand or, at the very least, have the opinion givers available in the courtroom for cross-examination. In our judgment, the provisions of K.S.A. 38-1583(e) apply only to cases under the KCCC, and we limit our opinion to that application.
In this case, evidence was erroneously admitted. The error, however, was harmless and does not require reversal of the trial court's decision.
Affirmed.