NOT DESIGNATED FOR PUBLICATION

No. 127,540

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.C.N., a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD MACIAS, judge. Submitted without oral argument. Opinion filed November 21, 2025. Reversed.

*Anita Settle Kemp* and *Jordan E. Kieffer,* of Wichita, for appellant natural father.

*Amanda M. Marino,* of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee.

Before HILL, P.J., MALONE and HURST, JJ.

HURST, J.: Father, an incarcerated single parent, appeals from the district court's determination that his child, D.C.N., was a child in need of care (CINC) and the subsequent termination of his parental rights. Although that might sound routine, this case presents atypical circumstances. Unlike most CINC adjudications, D.C.N. was being well cared for by a temporary guardian, "Dana," at the time and thus was not in need of care in the traditional sense. In a further twist, it is Dana—not the State—who sought the CINC adjudication, and Dana took this path only after Father refused to consent to her adoption efforts.

The district court's CINC adjudication hinges on Father's status as an incarcerated parent for D.C.N.'s entire life, but mere incarceration does not automatically result in a CINC adjudication as to the incarcerated parent. For the first part of D.C.N.'s life,

1

Father's romantic partner cared for D.C.N. as a mother and apparently facilitated Father's parental relationship. Unfortunately, she died when D.C.N. was just two years old. Thereafter, her mother Dana began caring for D.C.N. under a temporary guardianship that Father consented to with the understanding that Dana would continue facilitating his parental relationship.

However, after a couple of years, Dana ceased contact with Father because she believed it was not in D.C.N.'s best interests to know that his father was incarcerated. Dana's lack of contact and refusal to facilitate the parental relationship angered Father, and he engaged in a letter writing campaign that vacillated between begging for contact and threatening legal action. Father's actions, which the district court characterized as threatening the temporary guardianship, made Dana fearful she would lose custody, so she petitioned to adopt D.C.N. pursuant to K.S.A. 59-2129. D.C.N.'s biological mother consented to the adoption, but Father did not. Thereafter, instead of continuing with that action and seeking to terminate Father's parental rights through the adoption process, Dana filed an action to have D.C.N. adjudicated as a CINC and then to subsequently terminate Father's parental rights.

Under the unique circumstances here, this court is not persuaded that clear and convincing evidence supports the district court's finding that D.C.N. was without adequate parental care, control, and subsistence based on Father's incarceration to support a CINC finding in accordance with the applicable statutory guidelines. As a result, the CINC finding of the district court is reversed.

FACTUAL AND PROCEDURAL BACKGROUND

D.C.N. was born in December 2015 to Mother and Father but immediately began being cared for by Father's romantic partner, L.W. According to Father, it was always the plan that L.W. and Father would parent and raise D.C.N. However, Father was arrested

2

on federal charges during Mother's pregnancy and has remained incarcerated since his arrest. L.W. became D.C.N.'s informal adopted mother as planned.

L.W. unexpectedly died in December 2017 just two years after taking custody of D.C.N. After L.W.'s death, her mother Dana began caring for D.C.N. Father believed that Dana, who he considered a friend and a grandmother to D.C.N., would be a safe, caring, and responsible guardian for his child. Father and Dana informally agreed that she would keep Father apprised of D.C.N.'s well-being through regular communication.

About three months after L.W.'s death, on March 1, 2018, Dana petitioned for legal temporary guardianship of D.C.N. under case number 2018-PR-000255-GU. Father signed a waiver of notice and consent to Dana's appointment as guardian. The waiver described the guardianship as temporary: "In giv[ing] this consent, I understand that this action is not a termination of my parental rights, an adoption, or any other permanent action and that I may petition the Court to vacate this Guardianship at anytime."

Father attached an "Affidavit Statement" to his signed consent and a letter to Dana's attorney requesting that the affidavit become a "part of this proceeding" and for Dana to receive a copy. In the Affidavit Statement, Father included a list of his desires and expectations as D.C.N.'s parent, including that he:
- asserted his parental rights;
- wished for Dana to stand as guardian until he was released from incarceration;
- reserved the right to vacate the guardianship at any time he deemed appropriate based on D.C.N.'s best interests;
- named alternative guardians in the event Dana was no longer available including his eldest daughter;
- requested weekly or at least monthly updates on D.C.N.'s life and progress by phone, letter, visitations, or email;

3

- requested consultation about major events;
- requested that his son be called his given name;
- requested that Dana love and hug D.C.N. several times a day, be disciplined when appropriate, and taught at every opportunity; and
- stated that he was grateful to Dana and her daughter for their act of kindness in caring for D.C.N.

On March 12, 2018, Dana's attorney sent a letter to Father with a copy of the Order of Appointing Guardian for a Minor, reassuring him that: "I have also enclosed the letter that you sent me. I am unable to file documents on behalf of a third party, as the court has gone to an e-filing system for attorneys. I have retained a copy for our file."

Unfortunately, the relationship between Father and Dana broke down when she decided—against Father's wishes—that due to D.C.N.'s age, visits and phone calls with Father were confusing and detrimental to D.C.N.'s welfare.

According to Father's handwritten contact log, he received a short letter and updated pictures from Dana in September 2019. The log states that Father received a prison form stating they rejected a letter from Dana in October 2019 due to the color of the stationery. In December 2019, Father sent a "long letter to [Dana] about not giving up [his] parental rights and her selfishness of not telling [D.C.N.] more about his father." Father also sent Dana a letter in the second week of January 2020 requesting D.C.N.'s birth mother's contact information and discussing Dana's decision not to tell D.C.N. about Father. According to Father's handwritten contact log, he called Dana several times between January and December 2020 and had his sister call and text her, but Dana did not answer or respond from March through October. Additionally, Father's log indicates he sent letters to Dana in February, March, April, May, June, July, September, October, November, and December 2020—each time requesting access to D.C.N. and for Dana to get better at updating Father. For example, in a letter sent on March 30, 2020, Father

4

wrote Dana and expressed that he desperately missed D.C.N. and wanted more contact and to have a relationship with him before his release.

On June 1, 2020, Father sent a "Letter of Ultimatum" to Dana, stating he "was not lying or bullshitting you when I told you I'm pretty good with the law." Father explained that they had agreed to the temporary guardianship subject to Dana communicating with Father as well as visiting and that Dana "totally lost sight of the stipulations" regarding his consent. Father explained that the lack of interaction "will stop or I will file in Court and take [D.C.N.] from you and put him with my sister cause she will make sure my son knows about his father and will bring him to see me, and my son will know his father." Father wrote that he would pursue court action if Dana did not comply with his requests: "Go check your file on Guardianship and the consent form and my Affidavit Statement where I can Vacate that guardianship at anytime."

Father also expressed sadness at the breakdown of his and Dana's relationship and his lack of access to D.C.N.; he stated that he would rescind her guardianship if she did not return to their original agreement:

> "Let me be clear, I have NOT filed these enclosed documents, they are merely a message to you of what I can legally do, and let me be clear I will file documents of this nature with other documents in legal court form if you do not get back to our original agreement to include the following:

1. Answer your calls from me and my Sister [D.D.]
2. Start emailing me about things [D.C.N.] does and says on a regular basis. 1, 2, 3 times a week.
3. Send me pictures once a month or at least every 2 months.
4. Send me [D.C.N.'s] phone number, and teach him how to text/email me. He's smart . . . .
5. You will send in those visiting forms for you and [D.C.N.] I sent last year . . . .
6. You will bring [D.C.N.] to come see me or you will allow my sister to pick him up and bring him to come see me. One or the other, every 3-4 months.

5

7. You will start telling my son about his Daddy and keep whatever issue you have stuck in your head with me to yourself."

Father gave Dana 30 days to comply or he would file documents to rescind the guardianship and have D.C.N. placed with his sister. Father stated that he would "not continue to have you keep my son from me, and [Dana] let me assure you this is my right and [D.C.N.'s] right as his father, so if your listening to some idiot, that I cant do this, then you truely dont know the law." Father attached to the letter a handwritten draft "Petition to Reassign Guardianship of [D.C.N.] To: [D.D.]," in which Father said he believed Dana intended to keep D.C.N. and exclude Father altogether and that he was afraid of losing his rights. Father also alleged that he believed Dana's attorney's failure to include his Affidavit Statement with the guardianship filing was done for nefarious reasons—to exclude Father from D.C.N.'s life. Finally, Father also agreed to provide Dana regular access to D.C.N. and allow visits to maintain D.C.N.'s relationship with his "Nana."

On June 29, 2020, about a month after Father's ultimatum-type letter, Dana called the police to report harassing messages from Father's sister. Dana said that on May 13, 2020, Father's sister texted her that if she did not "get right with what [Father] is asking," Father would "show up at [her] door." Dana reported she received an email on June 29 originally sent from Father to his sister and then forwarded to her which discussed D.C.N.'s custody and told his sister to call Dana every hour until she answers the phone. Dana told police she was trying to adopt D.C.N. and that she was afraid Father would send someone to her house to hurt her or kidnap D.C.N.

According to Father's log, someone called him in November 2020 and told him Dana would answer his calls in a couple weeks and that his letters made Dana mad and she wanted to pursue full custody of D.C.N. Father sent multiple letters and cards in November and December 2020 and said that on January 19, 2021, he sent notice with a

6

"two-week warning" for Dana to adhere to the original agreement and permit him access to D.C.N. or he would file a petition for review of guardianship.

On January 29, 2021, 10 days after Father sent Dana the "two-week warning" letter, Dana filed a "Petition for Authority to Consent to Adoption" under K.S.A. 59-2129. Through this, Dana sought to adopt D.C.N. either through the parents' consent or without their consent after termination of parental rights, alleging that neither parent had custody of or meaningful contact with D.C.N. since birth. The court filed a notice and order for hearing on Dana's petition to take place on February 16, 2021. On February 17, Father filed a "Motion to Oppose the Adoption of [D.C.N.]," seeking the dismissal of Dana's petition and a pro se "Petition for Review of Guardianship and Set Contact Schedule." In his motion, Father opposed the adoption based on Dana's irrational and unreasonable actions and requested that the court dismiss the adoption petition; hold a full trial on the issue if not dismissed; appoint Father an attorney; and that he be present by phone or in person for all hearings.

Rather than address Dana's motion as an opposed adoption, according to Dana's attorney the judge directed Dana to file a Child in Need of Care (CINC) petition because Father had attacked the stability of the temporary guardianship. Thereafter, on September 23, 2021, Dana filed a "Petition for Child in Need of Care and Motion for Finding of Unfitness and Termination of Parental Rights." The Petition asserted that D.C.N.'s birth mother's parental rights were terminated in the adoption case—case No. 2021-AD-33—and D.C.N. was a CINC because he "is without adequate parental care, control or subsistence and it is not due solely to the lack of financial means of the child's parents or other custodian," under K.S.A. 38-2202(d)(1). The CINC petition also provided a basic rundown of Father's "extensive criminal history" and requested that the court find Father unfit to parent based on K.S.A. 38-2269(b)(5) for his conviction of a felony and imprisonment and based on K.S.A. 38-2269(b)(8) for his lack of effort to adjust his circumstances, conduct, or condition to meet the needs of his child.

On October 5, 2021, the court appointed Father an attorney for the CINC proceedings. Sometime before December 8, it became apparent that Father was an enrolled member of the Cherokee Nation, and thereafter the parties agreed that Father's enrollment implicated the Indian Child Welfare Act. At a hearing on December 8, 2021, Father's attorney requested to reinstate contact between Father and D.C.N., but D.C.N.'s guardian ad litem objected, claiming Father never met D.C.N. and thus the contact would be more harmful than beneficial. The evidence does not show that the GAL met with Father or the basis for the GAL's belief that the contact would be harmful. After further argument by the parties, the court found that there was "little, if any, engagement" between Father and D.C.N. and that contact was through Dana other than limited video conferences in 2017 when D.C.N. was a toddler. The court refused to order contact.

*The Hearing*

After appointing Father a new attorney and agreed continuances, the hearing began on September 20, 2022 and the district court heard evidence over four days from September 2022 to February 2023. As the petitioner, Dana called four witnesses to testify, including: Father; Brandi Timmerman Phillips, witness from the Cherokee Nation brought as a Qualified Expert Witness for ICWA purposes; a former roommate of L.W.; and herself. Father participated in the hearing in person via Zoom and by his attorney.

Dana called Father as a witness and questioned him about his criminal history, including exhibits showing his convictions and the June 29, 2020 police report describing Dana's allegations that Father's sister was harassing her via text. At the time of the hearing, Father had been serving almost seven and a half years on a federal drug conspiracy conviction. Before that, Father served just over four years in prison for possession of a stolen firearm. Assuming Father would serve all but 15 percent of his sentence, Father's earliest release date would be 2028. However, according to Father, if he received good time and was permitted to live in a halfway house, he could be released

between late 2024 or early 2025. Father said he would serve 18 months to 5 years on parole.

Father testified that his parental rights to two daughters were terminated in July 1990 because of his inability to parent due to his incarceration. Since then, Father formed a relationship with one of his adult daughters and explained that, unlike his experience in the 1990s, he was now older and more focused on parenting.

Evidence of Father's financial contribution to D.C.N. is mixed. Father said he took care of D.C.N.'s birth mother when she was pregnant and provided her and her two children a furnished place to live. According to Father, he was a co-owner of several businesses, and, at some point, Dana worked at a sports bar he co-owned. Dana eventually helped Father sell property and distribute the money to his books and to L.W. for D.C.N.'s care. Father believed about two-thirds of those proceeds went for D.C.N.'s care and one-third went to Father's books, and he used some of that book money for calls to D.C.N. Father estimated he provided between $20,000 and $25,000 to L.W. and D.C.N. in a two-year period. Father also testified that he provided the home in which D.C.N. and Dana lived. Father also testified that he had offered to have money taken to Dana for D.C.N.'s care but that for about the last two years Dana had refused the money. However, Father had not established a bank account that could be used to deposit money for D.C.N. and he was currently unable to send child support for D.C.N.'s ongoing care.

Dana testified that once during the guardianship, Father offered money to get some things for D.C.N. and to put the rest on his books. Dana refused the money. Contrary to Father's testimony, Dana insisted that Father never owned the home where she stays nor helped her pay for it and that she never received support from Father to help her pay rent. She said that Father had never sent gifts to D.C.N. until a couple of weeks before—and she did not accept a recent gift based on advice from her attorney. On cross-examination, Dana said Father gave her $1,000 for selling his camper while he was in

9

jail—which she gave to L.W. for D.C.N.'s care—but that the rest of the property she sold for Father went on his books per his direction.

Father testified that he had some phone and video visits with D.C.N. when L.W. was alive and when Dana first became D.C.N.'s guardian. However, Father said that Dana had completely cut him off in January 2020. Father said that he was concerned about his son, including during the beginning of the COVID-19 pandemic and continued with efforts to contact him through Dana but never threatened to come and take D.C.N. from Dana. Father testified that he completed tasks designed to enhance his parenting such as a Parenting From a Distance class in 2019 and a five-month program in January 2021 that focused on parenting through stages in a child's life. He was enrolled in the second phase of that class, which would focus on raising a teenager and co-parenting a child while incarcerated. In addition, he testified that he completed courses on drug use, criminal thinking, and preparation for re-entry. Father said he was seeking a therapist for anger management and antisocial issues based on his lack of trust of people.

Father stated that he could parent D.C.N. from prison by making frequent phone calls where he would give pep talks and advice, sending him letters, and engaging in visitation and special programs at the prison. Father said between August 2019 and January 2020, he had 15 attempted calls and 12 of which resulted in actual phone conversations with D.C.N. Father said he wanted to be there for D.C.N. and be a part of his life and would jump through any requirements the court ordered for him to be in D.C.N.'s life upon release. Father said that he never wanted to interfere with D.C.N.'s relationship with Dana and that she was taking good care of his son.

Dana testified that D.C.N. lived with her and was about seven years old at the time of the hearing. Dana worked with D.C.N.'s birth mother to set up the temporary guardianship. Dana said she started the guardianship sending pictures and updates to Father. However, Father wanted Dana to bring D.C.N. for visits and wanted to talk to

10

D.C.N. on the phone and tell the child his identity as his father. Dana thought it would be detrimental to tell D.C.N. that a man in prison who D.C.N. did not recognize was his father. Consistent with Father's testimony, Dana testified that she helped him sell items and put some of that on his books and kept up payments on Father's storage units and property for a while. Once Father got to prison in Colorado, he wanted her to help him set up the email system and add money to it and Dana decided not to do it because she believed it would cost her money.

According to Dana, once she stopped doing what Father wanted, she began receiving letters in which Father said he would have D.C.N. taken from her. Concerned about losing the temporary guardianship, Dana sought to adopt D.C.N. She said that when Father said in his letter that he was "pretty good with the law," she began to fear that the temporary guardianship could be revoked and D.C.N. could be removed from her home. Dana said she felt a threat to herself when Father said that if he was forced to take her to court, it would not "turn out good" for her and that he would not "keep being kicked on my ass again and again and not do something about it, not even from someone I love and truly care about."

Dana testified that D.C.N. had father figures in his life through her ex-husband and her son-in-law. Dana also explained that as a member of the Monacan Indian Nation, she was working to get D.C.N. involved with a mentor. At the time of adjudication, D.C.N. was enrolled in a private school setting, which Dana said worked well for him. She said D.C.N. had a referral to a doctor for an autism evaluation based on a recommendation from D.C.N.'s speech therapist but that he was doing well. Ultimately, Dana testified that the guardianship as it stood, even without threat, did not meet D.C.N.'s needs because he needed to be adopted into a permanent family.

11

*The district court's determination*

The district court held a hearing on June 12, 2023, at which it orally pronounced its findings and orders. The court stated, "having heard the testimony of witnesses, observing each for credibility based on the witnesses' voice intonation and body language, facial expression, testimonial cadences, and having reviewed all the exhibits admitted, makes the following findings" that Father was previously convicted of crimes in nine separate criminal cases. The court found that, not including his current incarceration, Father had been incarcerated in total for over 20 years with an earliest release date of April 2028 on the current case. While Father testified about various federal programs which may result in earlier release, as of the date of this appeal, neither party has filed notice that Father has been released from prison.

While Father was arrested just before D.C.N.'s birth and remained incarcerated during D.C.N.'s entire life, the court stated that Father made arrangements for D.C.N.'s care and then consented to the appointment of a guardian, but "[h]is consent was based, in part, upon the guardian's promise to allow him visits and provide regular updates during his incarceration." The court found that Father had some contact with D.C.N. via video or telephone during his incarceration until the contact was terminated by Dana. The court stated: "The guardian had decided, without any professional input, that [D.C.N.] should not be told that [Father] was his father. Petitioner then unilaterally suspended any visits for that reason." Following the suspension of visits, the court found Father made some efforts to contact his son and learn of his son's well-being.

The court explained that while Father did not suffer from emotional or mental issues that would make him unable to care for D.C.N., "given his current incarceration and for the foreseeable future, [Father] is unable to care for the ongoing physical, mental, and emotional needs of his child." The court further explained that Father

12

"has not engaged in conduct towards his child of a physical, emotional, or sexually cruel or abusive nature. Nor has there been evidence beyond a reasonable doubt indicating [Father] has been using intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render him incapable to care for the ongoing physical, mental, or emotional needs of his child."

The court then stated that ICWA applied and that reasonable efforts had been made to prevent the unnecessary breakup of the Indian family. At the hearing, Timmerman, the witness from the Cherokee Nation, testified that the tribe received 10 days' notice of the hearing but did not request a transfer of jurisdiction in this case. The district court found that Timmerman was a Qualified Expert Witness for the Cherokee Nation and for purposes of ICWA.

The court noted Dana's testimony that Father's statements undermined the stability of the guardianship. The court found that Father's letter forecasting legal action was "threatening and disconcerting. I don't know how it could be interpreted any other way." The court also found that Father's other letters were often "boastful and, indeed, threatening." The court explained that Dana did not receive "regular financial support" from Father for D.C.N.'s care. The court stated though "evidence showed that . . . on more than one occasion [Father] would direct [Dana] to sell property or assets that belonged to [Father] and utilize the finds derived from those transactions to be placed on his books or in his account." The court concluded that D.C.N. was a child in need of care by stating:

"The evidence is beyond a reasonable doubt that said child is without adequate parental care, control, or subsistence, and is not . . . due solely to the lack of financial means of the child's parents or other custodian . . . of the child, thereby resulting in the adjudication of this child. So we do have an adjudication that this child is a child in need of care under Kansas law."

13

*The Unfitness and Best Interests Determination*

At the same time as the CINC adjudication, the court found that Father was unfit to have a parental relationship with D.C.N.: "The evidence is not only clear and convincing, but it is beyond a reasonable doubt that [Father] is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." The court concluded that Father's unfitness was supported by K.S.A. 38-2269(b)(5), but the court did not apply the rebuttable presumption in K.S.A. 38-2271(a)(1) related to Father's parental rights having been previously terminated in the 1990s related to two other children. Additionally, the court did not find Father unfit under K.S.A. 38-2269(b)(8) where the court considers a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" because Dana's assertions related to that provision were merely restatements of conditions related to Father's incarceration under K.S.A. 38-2269(b)(5). The court found that there were no case plan tasks or other opportunities—like in a typical termination case—where Father could show whether he could change his conduct or condition. The court also noted that Father had testified as to the efforts he made to prepare himself for parenting upon his release from prison.

The court also found that the termination of parental rights was in the best interests of D.C.N. The court stated it "adopts the statements from the petitioner, at least as consistent with this opinion, and the petitioner's motion for a finding of unfitness and termination of parental rights" and the finding was "with respect to K.S.A. 38-2269(b)(5) and K.S.A. 38-2269." The court ordered termination of Father's parental rights pursuant to K.S.A. 38-2269(a).

The court found that D.C.N.'s relationship and bond with Dana and her family, Dana's excellent care for D.C.N., and the testimony of the Indian child welfare expert that

14

the tribe was in favor of placement with Dana was clearly established. The court then approved D.C.N.'s placement with Dana.

*The same is reflected in the journal entry.*

On September 25, 2023, the district court filed the "Indian Child Welfare Act Order of Adjudication and Finding of Unfitness and Order Terminating Parental Rights as to Father." The district court made findings related to jurisdiction and venue, ICWA, and the evidence it relied on for its orders. The district court found D.C.N. was a CINC under K.S.A. 38-2202(d)(1) and also documented the termination of Father's parental rights to D.C.N. based on K.S.A. 38-2269(b)(5).

The district court thus adjudicated D.C.N. as a CINC and terminated Father's parental rights to D.C.N. at the same time. The district court made additional findings as to D.C.N.'s placement and determined there was clear and convincing evidence that there was good cause to place D.C.N. with Dana.

Father appeals.

## DISCUSSION

Father appeals practically every aspect of this case. He argues the district court erred in adjudicating D.C.N. as a CINC; in finding Father unfit and that his unfitness would continue for the foreseeable future; in determining that termination of Father's parental rights was in D.C.N.'s best interests; and in failing to comply with the requirements of ICWA. Proceedings related to the termination of parental rights to a child are governed by the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., but in situations where a court knows or has reason to know an Indian child is involved, ICWA applies. See 25 U.S.C. § 1903(4); K.S.A. 38-2203.

15

A parent, even one incarcerated, has a constitutionally recognized fundamental right to a continuing parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Therefore, before interfering with that fundamental right, the district court must find clear and convincing evidence to adjudicate a child as a CINC and to find a parent unfit to properly care for their child. K.S.A. 38-2250; K.S.A. 38-2269(a); see *Santosky*, 455 U.S. at 769-70. Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. at 691. Clear and convincing evidence is such that the fact-finder believes the truth of the facts asserted is highly probable. 286 Kan. at 705. The first two issues on appeal question whether the State satisfied its burden to establish that D.C.N. was a CINC and that Father was unfit to parent in the present at the time of the hearing and in the foreseeable future.

I. *The district court erred in adjudicating D.C.N. as a CINC.*

Dana originally pursued adoption of D.C.N. through the Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 et seq. Father objected and refused to consent to the adoption. According to Dana's attorney, rather than continue with the contested adoption, the court directed Dana to pursue termination of Father's rights through K.S.A. 38-2201 because Father's actions destabilized the temporary guardianship, and thus CINC was a more appropriate venue.

Thereafter Dana filed the action underlying this appeal seeking a CINC adjudication under K.S.A. 38-2202(d)(1), which provides that a child is a CINC when they are "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian." Where a CINC adjudication is based on K.S.A. 38-2202(d)(1), the adjudication decision depends on a view of the child's present circumstances existing on the day of the adjudication

16

hearing. This is because the statutory measure in subsection (d)(1) is framed in the present tense—the child *is* without adequate parental care. *In re F.C.*, 313 Kan. 31, 37-39, 482 P.3d 1137 (2021); *In re D.H.*, 57 Kan. App. 2d 421, 428-30, 453 P.3d 870 (2019). Additionally, the statute provides that a parent "includes a guardian and every person who is by law liable to maintain, care for or support the child." K.S.A. 2024 Supp. 38-2202(aa).

The Revised Kansas Code for Care of Children provides the statutory mechanism for courts to adjudicate a child as a CINC and states that the Code shall be liberally construed to carry out the policies of the State, which are to:

"(1) Consider the safety and welfare of a child to be paramount in all proceedings under the code;

"(2) provide that each child who comes within the provisions of the code shall receive the care, custody, guidance control and discipline that will best serve the child's welfare and the interests of the state, preferably in the child's home and recognizing that the child's relationship with such child's family is important to the child's well being;

"(3) make the ongoing physical, mental and emotional needs of the child decisive considerations in proceedings under this code;

"(4) acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings under this code without unnecessary delay;

"(5) encourage the reporting of suspected child abuse and neglect;

"(6) investigate reports of suspected child abuse and neglect thoroughly and promptly;

"(7) provide for the protection of children who have been subject to physical, mental or emotional abuse or neglect or sexual abuse;

"(8) provide preventative and rehabilitative services, when appropriate, to abused and neglected children and their families so, if possible, the families can remain together without further threat to the children;

"(9) provide stability in the life of a child who must be removed from the home of a parent; and

17

"(10) place children in permanent family settings, in absence of compelling reasons to the contrary." K.S.A. 38-2201(b).

This court reviews a district court's CINC determination by viewing the evidence in the most favorable light to the prevailing party to determine whether it is convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the child was a CINC. See *In re B.D.-Y.*, 286 Kan. at 705. The appellate court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

The district court found D.C.N. to be a CINC by relying on two overarching issues: (1) Father's incarceration throughout D.C.N.'s entire life; and (2) Father's actions "threatening" the guardianship after Dana ceased communicating with Father and refused to facilitate his parental relationship. Father began his current term of imprisonment shortly before D.C.N.'s birth. As agreed by all parties involved, Father arranged for L.W., Father's romantic partner, to care for D.C.N. during his incarceration. It is undisputed that L.W. intended to and did become D.C.N.'s pseudo-adoptive mother until her untimely death about two years later. It is also undisputed that Father provided L.W. with financial assistance and maintained contact with L.W. and D.C.N. during that time.

After L.W.'s death, her mother Dana, who acted as D.C.N.'s grandmother figure, stepped in. Although Father testified that he originally planned for his oldest daughter to care for D.C.N. in his absence, Dana took immediate physical custody and wanted to continue as a temporary guardian. Father consented to Dana's temporary guardianship, and the district court found there was an agreement that Dana would ensure Father's continued parental relationship with D.C.N. Additionally, Dana's attorney assured Father that his requests regarding the guardianship were received and acknowledged. After Father and Dana apparently adequately functioned under these parameters for a couple years, Dana unilaterally cut off contact with Father and refused contact between Father

18

and D.C.N. Father testified that Dana's abrupt cessation of contact caused him fear for the health and welfare of his child, and then Father repeatedly attempted to contact Dana through letters, calls, and by having third parties contact her.

Panels of this court have held that—although not typical or perhaps strictly adhering with the common understanding of a CINC—a court may adjudicate a child as a CINC as to just one parent while the child is simultaneously in the safe and stable home of another parent or caregiver. This opinion need not address the propriety of that practice because this case is distinguishable from those instances. See *In re N.D.G.*, 20 Kan. App. 2d 17, 23-24, 883 P.2d 89 (1994); *In re B.S.*, No. 127,948, 2025 WL 1672261, at *1 (Kan. App. 2025) (unpublished opinion). First, this court is not aware of another similar case where the incarcerated parent arranged for a legal, appropriate, temporary guardianship in their absence. Additionally, in *In re N.D.G.*, the court explained that although Mother did "not want her parental rights severed . . . she shows no real desire to raise and care for her two children." 20 Kan. App. 2d at 20. And in *In re B.S.*, Mother alleged the incarcerated father failed to maintain regular visitation and communication, failed to provide financial support, abandoned and emotionally neglected their child, and failed to provide the care and control necessary for the child's physical, mental, or emotional health. 2025 WL 1672261, at *1. Those cases involved absentee parents who had not taken steps to ensure the adequate care, control, and subsistence of their child in their absence.

As the district court noted, D.C.N. was in a caring home under a legal temporary guardianship at the time of the CINC proceeding and there were no allegations of abuse, neglect, instability, or safety concerns related to D.C.N.'s care. Unlike the parents in *In re B.S.* and *In re N.D.G.*, Father has not abandoned his child and seeks to maintain a parental relationship, which is demonstrated through steps to arrange for a temporary guardianship (with L.W. and then Dana); sending early financial support; offering later gifts; sending numerous letters; making countless phone calls; taking parenting classes

19

specific to incarcerated parents; taking other self-improvement classes; and virtually begging Dana to remain in contact with him.

While the district court found some of Father's letters "threatening" to the guardianship, that factual finding does not support a legal conclusion that D.C.N. was "without adequate parental care, control or subsistence." Nothing in Father's letters resulted in a negative legal consequence to the temporary guardianship or undermined the care D.C.N. was receiving. Dana testified that when Father's letter said he was "pretty good with the law," she began to fear that D.C.N. would be taken from her custody. But Dana did not have a legal right to permanent guardianship, and there is no evidence that an alternative guardian would have been harmful to D.C.N. at the time. To be clear, the letters were desperate and exhibited entitlement, bravado, and a threatening tone through the lack of pleasantry and demands for updates and actions to facilitate his parental relationship. Dana testified about a June 2021 letter in which Father wrote that Dana "must have forgot who I am and how serious I take someone messing with those I love," and "[j]ust remember, I got an outdate and it's a lot sooner than you think you know. . . . I am tired of playing your stupid little girl games with my son." On another page Father wrote, "[a]nd after I get out, then what [Dana]????" The letters threatened that Father would take permissible legal action to ensure his relationship with D.C.N., which was well within his rights.

The temporary guardianship did not obviate Father's parental rights or prevent him from asserting his rights, or even seek to modify the temporary guardianship. A temporary "legal guardianship enables a parent to give another responsible party legal authority over the parent's children, and the parent can later take the children back and resume parenting duties." *In re Guardianship of H.C.*, No. 105,357, 2012 WL 687074, *at 1 (Kan. App. 2012) (unpublished opinion). As the legal guardian, Dana had custody and control of D.C.N. to provide for his care. K.S.A. 59-3075(b)(1). The appointment of a guardian does not diminish the legal rights of the parent—but it does dictate the person

20

responsible for the child's care in the parent's stead. See Elrod, Child Custody Practice and Procedure § 4:6 (2025-2026 ed.). According to Professor Elrod's treatise, "Guardianships give parents an opportunity to temporarily relieve themselves of the burdens involved in raising a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future." Elrod, Child Custody Practice and Procedure § 4.6 (2025-2026 ed.). Thus, a parent often will enter a voluntary guardianship if children are going to be with a third party for an extended period. Nelson, Practitioner's Guide to Kansas Family Law § 6.24 (3d ed. 2023). Had Father or Dana filed an action to modify temporary guardianship, that would have triggered the district court's duty to determine whether further proceedings were needed which would include an ultimate determination of the continuing need for the guardianship. See K.S.A. 59-3091(c)-(h).

Knowing of his unavailability due to imprisonment, Father took the appropriate legal steps to ensure D.C.N.'s care in his absence. The CINC statute seems to contemplate such when it defines a parent to include "a guardian and every person who is by law liable to maintain, care for or support the child." K.S.A. 2024 Supp. 38-2202(aa). Essentially, in being D.C.N.'s temporary guardian in lieu of Father, Dana was acting on Father's behalf and under his parental authority. Dana became D.C.N.'s temporary guardian with an understanding of Father's desire that she continue to permit and facilitate his parental relationship. The district court found that Father's consent to the guardianship "was based, in part, upon the guardian's promise to allow him visits and provide regular updates during the incarceration."

Therefore, finding that a parent who consents to a temporary guardianship with clearly stated expectations that the temporary guardian facilitates their parental relationship cannot later seek to ensure their parental relationship would desensitize the use of appropriate temporary guardianships, undermine their purpose, and be contrary to the temporary guardianship statute. Moreover, had Father done nothing in response to

21

Dana's cessation of contact, the court could have used that as evidence of abandonment. See, e.g., *In re C.H.*, No. 112,369, 2015 WL 1882223, at *5-7, 9 (Kan. App. 2015) (unpublished opinion). In other words, Father would be in an impossible situation—where his efforts to ensure a parental relationship by seeking legal recourse would be used as evidence that D.C.N. is a CINC just as his failure to object could be used as evidence of abandonment. While Father "threatened" to change the temporary guardianship to ensure his continuing parental relationship, that did not demonstrate a lack of adequate parental care, control, or subsistence but rather an effort to provide such.

Other than Father's desire to modify the temporary guardianship to ensure his parental involvement, the district court relied on Father's imprisonment for D.C.N.'s entire life as evidence that D.C.N. was a CINC. But the CINC statute does not include mere incarceration as a reason for adjudicating a child as a CINC. Although incarceration is often a fact that supports other findings supporting a CINC determination, the district court made no such findings here. See, e.g., *In re K.W.D.*, 321 Kan. 100, 103-05, 573 P.3d 221 (2025) (incarcerated parent did not contest CINC determination where children were not in a safe, stable home during the father's incarceration). In addition to the temporary guardianship, Father took active steps to improve his parenting through classes and programs, maintained contact, provided early financial assistance, and offered gifts that were refused. Although Father had not been in contact with D.C.N. for an extended period at the time of adjudication, that was because the temporary guardian blocked his contact with his son. If mere incarceration supported a CINC determination as to the imprisoned parent, there would be no need for judicial review and findings. But that is not the case—nor should it be.

Here, D.C.N. is being cared for by a nonbiological parental figure whom Father had consented to act as a legal guardian in his absence, and that person wants to make the guardianship permanent. Given that D.C.N. was in that safe, stable environment at the time of adjudication, this case is more analogous to a stepparent adoption case. See, e.g.,

*In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.3d 145 (1987); *In re T.H.*, 60 Kan. App. 2d 536, 551, 494 P.3d 851 (2021). That is likely why Dana first pursued a third-party adoption before this CINC effort. Dana's plan would be easier had Father consented to her adoption efforts, but the contested termination of parental rights is intentionally cumbersome. Under these circumstances, where Father had arranged for a temporary legal guardian in his absence, his efforts to use the legal process to ensure his involvement in D.C.N.'s life coupled with his imprisonment do not provide clear and convincing evidence that D.C.N. was "without adequate parental care, control or subsistence" making him a CINC as to Father.

This court does not discount the difficulty in being a temporary guardian and balancing D.C.N.'s needs under these circumstances. Nor does this court doubt Dana's sincere belief that D.C.N.'s interests are best served by not having a parental relationship with Father. But that sincere belief does not entitle her to unilaterally refuse Father contact with his child or support the district court's CINC determination under K.S.A. 38-2202(d)(1). Father was permitted to object to Dana's changes, and those objections do not mean that D.C.N. was "without adequate parental care, control or subsistence." Had Dana told Father from the beginning—before he consented to the temporary guardianship— that she would not facilitate his parental relationship, perhaps Father would have sought a different guardian that would have continued to facilitate his parental relationship. This decision does not leave Dana or Father without recourse, as their dispute regarding whether Dana should or must facilitate Father's parental relationship can be resolved through the temporary guardianship statutes or through Dana's contested adoption petition.

II.    *Father's remaining claims are of no legal consequence given this court's finding.*

After a court adjudicates a child as a CINC, it may then be asked to terminate that parent's rights to the child. Typically there is some time between those two events to allow the parent to complete tasks related to rehabilitation of the parental relationship when reintegration is deemed appropriate. However, here the district court terminated Father's rights at the same hearing and then found Dana an appropriate adoptive placement. Given that the district court erred in adjudicating D.C.N. a CINC, it had no authority to contemplate the termination of Father's parental rights or D.C.N.'s adoptive placement. This court need not address Father's claims related to the same.

Father also argues the district court erred and denied him due process when it denied his request to subpoena the guardian ad litem to testify. Presumably Father believed this testimony would assist in refuting Dana's contention that termination of his parental rights was in D.C.N.'s best interests. Father also contends that the district court failed to comply with ICWA.

After some discussion, the district court ultimately found that ICWA applied and undertook compliance with its requirements. ICWA provides certain protections in proceedings related to child custody, and—relevant here—ICWA bars involuntary termination of a parent's rights in the absence of a heightened showing that serious harm to the Indian child is likely to result from the parent's "continued custody" of the child. 25 U.S.C. § 1912(f); see K.S.A. 38-2203. On appeal, the State contends the court properly complied with ICWA and alternatively that ICWA "arguably" does not apply under the United States Supreme Court's *Baby Veronica* case. See *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013). However, there is no cross-appeal challenging the district court's finding that ICWA applied.

Given that this court finds the district court's CINC determination was an error, the decision is reversed. Father's due process and ICWA claims are immaterial to the disposition of this case. See *In re M.F.*, 290 Kan. 142, 158, 255 P.3d 1177 (2010) (finding errors in the CINC proceeding rendered other questions about ICWA and best interests determination moot). Generally, Kansas appellate courts only decide real controversies capable of adjudication, not questions lacking operative legal consequence, and they do not provide advisory opinions. See *State v. Roat*, 311 Kan. 581, 590, 466 P.3d 439 (2020), *overruled on other grounds by State v. Phipps*, 320 Kan. 616, 570 P.3d 1240 (2025). However, if Father's remaining issues are likely to recur on remand, this court could address them. See, e.g., *State v. Wells*, 289 Kan. 1219, 1234, 221 P.3d 561 (2009). In this case, any future court proceeding regarding Father's parental rights will necessarily involve different facts and evidence and perhaps even a different legal procedure. Thus, any decision regarding Father's remaining claims would be merely advisory, and this court declines to speculate how they could be applied in the future.

CONCLUSION

The evidence before this court is insufficient to support the district court's finding that D.C.N. was a CINC as to Father under K.S.A. 38-2202(d)(1). The case is reversed and remanded with directions to dismiss the CINC petition.

Reversed.

***

MALONE, J., dissenting:  I respectfully dissent from the majority's disposition of this appeal. To begin, I question why the district court in the adoption case directed "Dana" to file a Child in Need of Care (CINC) petition under the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq. This case would have been less complicated and the issues could have been adequately addressed had the probate court simply held a

25

hearing to determine whether Father's parental rights should be terminated under K.S.A. 59-2136 as part of the contested adoption proceedings. But there was nothing legally preventing Dana from filing a private CINC petition and seeking termination of Father's parental rights under Chapter 38, so we must address the issues presented in this appeal.

First, there was clear and convincing evidence to support the district court's finding that *as to Father*, D.C.N. was without adequate parental care, control, or subsistence and the condition was not due solely to the lack of financial means of the parents or other custodian. See K.S.A. 38-2202(d)(1). The fact that D.C.N. was in a caring home under a temporary guardianship at the time of the CINC proceedings does not preclude the district court from adjudicating D.C.N. as a CINC as to Father. See *In re N.D.G.*, 20 Kan. App. 2d 17, 23-24, 883 P.2d 89 (1994); *In re B.S.*, No. 127,948, 2025 WL 1672261, at *1 (Kan. App. 2025) (unpublished opinion). In fact, a similar situation exists in most CINC proceedings initiated by a private individual. Thus, I would affirm the district court's CINC adjudication.

Next, viewing the evidence in the light most favorable to the prevailing party, there was clear and convincing evidence that Father was unfit due to his conviction of a felony and imprisonment under K.S.A. 38-2269(b)(5), and this condition is unlikely to change in the foreseeable future. At the time of the hearing in September 2022 to February 2023, Father had been incarcerated for D.C.N.'s entire lifetime on federal drug and firearm convictions. Father's earliest release date is 2028.

"In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009). Nor does the inquiry end merely because the underlying condition resulting in parental unfitness, such as imprisonment, has a defined endpoint. "[T]he critical question under Kansas law is not just whether the

26

parent will be physically available, but whether the parent will be able to properly care for the child in a time frame consistent with the child's best interests." *In re K.W.D.*, 321 Kan. 100, 113-14, 573 P.3d 221 (2025).

Kansas courts have held that incarceration alone is not enough to support a finding of unfitness under K.S.A. 38-2269(b)(5). See, e.g., *In re T.H.*, 60 Kan. App. 2d 536, 536-37, 494 P.3d 851 (2021). But not only has Father been incarcerated for D.C.N.'s entire lifetime, he has been incarcerated for a substantial portion of his adult lifetime. Father, born in 1964, has an extensive criminal history spanning from 1982 to 2015. Father testified that his parental rights to two daughters were terminated in 1990 because of his inability to parent due to his incarceration. He did not learn much from this experience. Father clearly desires to have a parenting relationship with D.C.N. and this desire is commendable. But Father has never been able to parent D.C.N. on a day-to-day basis because he chose a lifetime of crime instead. These circumstances are sufficient to support the district court's finding of unfitness under K.S.A. 38-2269(b)(5).

Finally, the district court did not abuse its discretion in finding that termination of Father's parental rights was in D.C.N.'s best interests, giving primary consideration to the physical, mental, and emotional needs of D.C.N. See K.S.A. 38-2269(g)(1). I also would find that the district court complied with all requirements of the Indian Child Welfare Act. See 25 U.S.C. § 1901 et seq. Although this case may present a closer call than others, I would affirm the district court's judgment terminating Father's parental rights.